THE PEOPLE, *ex rel.* HACKLEY, *v.* KELLY, &c.,

AND MATTER OF ANDREW J. HACKLEY.

The Constitution (Art. 1, § 6,) does not protect a witness in a criminal prosecution against another from being compelled to give testimony which implicates him in a crime when he has been protected by statute against the use of such testimony on his own trial,

That the information thus elicited facilitates the discovery of other evidence by which the witness may be subsequently convicted, is an incidental consequence against which the Constitution does not guard him. Its prohibition is simply against his being required to give evidence where he himself is upon trial.

The refusal of a witness to answer a proper question before a grand jury is punishable as a contempt under the statute (2 R. S., p. 534, § 1, p. 735, § 14), as committed in a proceeding upon an indictment.

When the refusal was reported by the grand jury to the court in the presence of the witness, who did not deny but justified the same, and reiterated the refusal, the contempt is one "in the immediate view and presence of the court," and no affidavit or further evidence is requisite to a commitment.

The appellate court, before which the propriety of a commitment for contempt is brought by *certiorari*, or even collaterally on *habeas corpus* is bound to discharge the prisoner where the act charged as criminal is necessarily innocent or justifiable, or where it is the mere assertion of a constitutional right.

The adjudication of the court in which the alleged contempt occurred, while conclusive that the party committed the act whereof he was convicted, and of its character when that might, according to the circumstances, be meritorious or criminal, cannot establish as a contempt that which the law entitled the party to do.

THE first case was an appeal from a judgment of the Supreme Court, by which Hackley, the relator, was remanded to the custody of the sheriff, after a hearing of his case upon a return to a writ of *habeas corpus*, issued at his instance to the said sheriff. The other was an appeal from the judgment of the same court, dismissing a *certiorari* which Hackley had procured to be issued to the Court of General Sessions of the city and county of New York, to review an order of that court, adjudging him guilty of a criminal contempt, and to be imprisoned therefor the term of thirty days; from which imprisonment it was also the purpose of the *habeas corpus* to relieve him. The object of the proceeding in both cases was to determine the legality of the conviction of Hackley for a contempt.

The record of the Court of Sessions, set out in the return to the *habeas corpus* and in the return to the *certiorari*, was as follows:

At a Court of General Sessions of the Peace, holden in and for the city and county of New York, &c., April 31, 1861.

Present—JOHN T. HOFFMAN, Recorder.

In the matter of Andrew J. Hackley.

The grand jury, heretofore in due form selected, drawn, summoned and sworn to serve as grand jurors, in the Court of General Sessions of the Peace in and for the city and

county of New York, come into court and make complaint by and through their foreman, theretofore duly appointed and sworn, that Andrew J. Hackley, after being duly summoned and sworn, as prescribed by law, as a witness in a certain matter and complaint pending before such grand jury, whereof they had cognizance, against certain aldermen and members of the common council of the city of New York, for feloniously receiving a gift of money, under an agreement that their votes should be influenced thereby in a matter then pending before said aldermen and members of the common council in their official capacity, did then and there refuse to answer the following legal and proper interrogatory, propounded to him, the said Andrew J. Hackley, to wit: "What did you do with the pile of bills received from Thomas Hope, and which he told you amounted to fifty thousand dollars?" And the said Andrew J. Hackley then and there, instead of answering the said interrogatory, stated as follows, to wit: "Any answer which I could give to that question would disgrace me, and would have a tendency to accuse me of a crime. I therefore demur to the question, referring to the ancient common law rule, that no man is held to accuse himself, and to the sixth section of the first article of the Constitution of this State." And the court having then and there decided that the said interrogatory is a legal and proper one, and that the reasons given by the said Andrew J. Hackley for not answering the same are invalid and insufficient; and now ordering the said Andrew J. Hackley to answer the said interrogatory, and he, the said Andrew J. Hackley, still contumaciously and unlawfully refusing to answer the said interrogatory, the court doth hereby adjudge the said Andrew J. Hackley, by reason of the premises aforesaid, guilty of a criminal contempt of court; and doth further order and adjudge that the said Andrew J. Hackley, for the criminal contempt aforesaid, whereof he is convicted, be imprisoned in the jail of the county for the term of thirty days.

Hackley appealed from the judgment of the Supreme Court in both cases.

*James T. Brady* and *Amasa J. Parker*, for the appellant, maintained that the provision in the Constitution, which declares that no person "shall be compelled in a criminal case to be a witness against himself," should not be limited to testimony in criminal prosecutions against the party, but that by a proper and necessary construction, it should be held to protect every person from being required in any case, to give testimony, the tendency of which would be to accuse him of a crime. If the rule could be affected by legislation, then it was not enough that he should be guarded against having his testimony given in evidence, as his admission, in a prosecution which might be afterwards brought against him, as was done by the statute relied on, but that he should be wholly protected against any prosecution for the offence; inasmuch as his testimony might disclose facts and circumstances which, being thus ascertained, might be proved against him by testimony other than his sworn admission. They also insisted that the commitment was void on its face, because the Revised Statutes did not make a refusal to testify before a grand jury a contempt; and, also, that the commitment did not show that his misconduct was committed in the immediate view and presence of the court, or that the facts were proved by affidavit served on the accused, with a reasonable time given him to make his defence.

*John H. Anthon*, for the respondent, besides controverting those positions, argued that the propriety of the commitment could not be examined upon the return to a writ of *habeas corpus.*

DENIO, J. As a general rule, the propriety of a commitment for contempt is not examinable in any other court than the one by which it was awarded. This is especially true where the proceeding by which it is sought to be questioned is a writ of *habeas corpus;* as the question on the validity of the judgment then arises collaterally, and not by the way of review. The *habeas corpus* act, moreover, declares that where the detention of the party seeking to be discharged by

*habeas corpus* appears to be for any contempt, plainly and .specially charged in the commitment, ordered by a court of competent jurisdiction, he shall be remanded to the custody in which he was found. But this rule is of course subject to the qualification, that the conduct charged as constituting the contempt must be such that some degree. of delinquency or misbehavior can be predicated of it; for if the act be plainly indifferent or meritorious, or if it be only the assertion of the undoubted right of. the party, it will not become a criminal contempt by being adjudged to be so. The question whether the alleged offender really committed the act charged, will be conclusively determined by the order or judgment of the court; and so with equivocal acts, which may be culpable or innocent according to the circumstances; but where the act is necessarily innocent or justifiable, it would be preposterous to hold it a cause of imprisonment. Hence, if the refusal of Mr. Hackley, the relator, to answer the question propounded to him, was only an assertion of a right secured to every person by the Constitution, it was illegal to commit him for a contempt; and this error was certainly reached by the *certiorari,* if not examinable on the return to the *habeas corpus.*

On the other hand, if the case was such that he was obliged by law to answer the inquiry, the power of the court to punish him for his refusal was undoubted. If the case is not reached by the statute, the power would be ample at the common law. But I am of the opinion that the statute applies to the refusal of a witness to answer a legal question put to him by the grand jury, to the same extent as though he were called to give testimony on the trial of an issue before the court or a petit jury. The act declares that courts of record have power to punish by fine and imprisonment any misconduct by persons summoned as witnesses, for refusing to be sworn or to answer as such witnesses. (2 R. S., p. 534, § 1, subd. 5.) The title of the Revised Statutes in which this is found relates primarily to proceedings in civil cases. By another provision, however, the enactment just mentioned, together with several other directions relating to trials in civil cases, are declared to

extend to trials and other proceedings on indictments, so far as they may be in their nature applicable thereto. (2 R. S., p. 735, § 14.) The criticism of the appellant's counsel is, that the examination of a witness before a grand jury is not a proceeding upon an indictment, and so not within the statute. In one sense it is not. But by the theory of proceedings in criminal cases, the indictment is supposed to be prepared and taken before the grand jury by the counsel prosecuting for the State; and the evidence is then given in respect to the offence charged in it. If the party accused appears to be guilty, the indictment is certified to be a true bill: otherwise, it is thrown out. In that view of the practice, all which takes place before the grand jury as well as the subsequent steps may be said to be proceedings upon the indictment.

It is further urged on the part of the relator that the conviction is erroneous because it does not appear that the contempt was committed in the presence of the court, and that there was no proof by affidavit, as required by the statute. (2 R. S., p. 535, §§ 2, 3.) It appears by the record returned, that, the relator and the grand jury being present in open court, it was stated on the part of the jury that the relator had declined to answer the inquiry touching the disposition of certain moneys which had come to his hands—basing his refusal upon the constitutional provision. The question being thus presented for the determination of the Court of Sessions, it held that the constitutional provision did not apply, and the relator was thereupon directed to answer the interrogatory as required by the grand jury. It is not to be understood that the order was to proceed with the examination on the spot. What was said was for the purpose of settling the rights and duties of the witness and of the jury, when they should be again convened in the grand jury room. The witness might have postponed his election whether he would obey or not, until the examination before the jury was resumed; but he chose, as was doubtless the most convenient course, to declare his determination at once. He thereby waived the formality of having the question repeated in the

jury room, and the court was at liberty to act, as it did, upon that waiver. The refusal of the prisoner to give testimony in answer to the contested question was made in the face of the court. If such refusal was a contempt, such contempt was committed "in the immediate view and presence of the court;" and it was authorized by the statute to act without further evidence.

But if it were necessary to proceed under the other branch of the statute, and to prove to the court the transaction before the grand jury, the conviction would not be even erroneous. The relator and the jury being present, the latter reported the particulars of the contumacy with the relator, including his reasons for refusing to answer. It does not appear that it was denied by him, or that he asked for time to refute what was alleged against him. On the contrary, when informed that it was his duty to answer, he, as the record states, still refused to answer. The whole of these proceedings assume that the statement of the jury was conceded by the witness to be a correct account of what had transpired up to that time. The appearance of the relator before the court must have been gratuitous; for there is no statement that any notice had been given or any process issued. His voluntary appearance and his persistence in the course which it was alleged he had taken before the grand jury was an implied admission of the facts, and a waiver of further time to defend himself. It is apparent that the question was presented in a manner somewhat informal; but it was assented to by the parties, in order to have a prompt determination of the constitutional question involved.

There seems, therefore, to be nothing to preclude us from examining the main question, whether the relator could lawfully refuse to answer the interrogatory put to him.

The bribery act of 1853, declares the giving to or receiving money, &c., by any of divers public officers named, including any member of the common council of a city, with a view to influence their action upon any matter which may come officially before them, an offence punishable by fine and imprisonment in a state prison. For the purpose of enabling

the public to avail itself of the testimony of a participator in the offence, the fourteenth section provides as follows: "Every person offending against either of the preceding sections of this article shall be a competent witness against any other person so offending, and may be compelled to appear and give evidence before any magistrate or grand jury, or in any court in the same manner as other persons; but the testimony so given shall not be used in any prosecution or proceeding, civil or criminal, against the person so testifying." (Ch. 539.) A similar provision is found in an act to amend the charter of the city of New York, passed in 1857. The fifty-second section relates to bribes of the members of the common council and the officers of the corporation, making the giving and the receiving of bribes highly criminal, and concluding with an enactment substantially similar to the fourteenth section of the act of 1853. The design was to enable either party concerned in the commission of an offence against the act, to be examined as a witness by the grand jury or public officer entrusted with the prosecution. The question to be determined is whether these provisions are consistent with the true sense of the constitutional declaration, that no person shall be compelled in any criminal case to be a witness against himself. (Art. 1, § 6.)

The primary and most obvious sense of the mandate is that a person prosecuted for a crime shall not be compelled to give evidence on behalf of the prosecution against himself in that case. It is argued that no such narrow and verbal construction could have been in the view of the authors of the article, for the reason that no such atrocious procedure as that supposed has been tolerated in civilized countries in modern times. But constitutional provisions are not leveled solely at the evils most current at the times in which they are adopted, but, while embracing these, they look to the history of the abuses of political society in times past, and in other countries, and endeavor to form a system which shall protect the members of the State against those acts of oppression and misgovernment which unrestrained political or judicial power are always and

everywhere most apt to fall into. (See the observations of Chief Justice SPENCER on this subject, reported in 18 John., 202.) The history of England in early periods, furnishes abundant instances of unjustifiable and cruel methods of extorting confessions; and the practice at this day in the criminal tribunals of the most polished countries in continental Europe is to subject an accused person to a course of interrogatories which would be quite revolting to a mind accustomed only to the more humane system of English and American criminal law. It was not, therefore, unreasonable to guard by constitutional sanctions against a repetition of such practices in this State; and it is not at all improbable that the true intention of the provision in question corresponds with the natural construction of the language. But there is great force in the argument that constitutional provisions, devised against governmental oppressions, and especially against such as may be exercised under pretence of judicial power, ought to be construed with the utmost liberality, and to be extended so as to accomplish the full object which the author apparently had in view, so far as it can be done consistently with any fair interpretation of the language employed. The mandate that an accused person should not be compelled to give evidence against himself, would fail to secure the whole object intended, if a prosecutor might call an accomplice or confederate in a criminal offence and afterwards use the evidence he might give to procure a conviction on the trial of an indictment against him. If obliged to testify on the trial of the co-offender to matters which would show his own complicity, it might be said upon a very liberal construction of the language that he was compelled to give evidence against himself, that is, to give evidence which might be used in a criminal case against himself. It is perfectly well settled that where there is no legal provision to protect the witness against the reading of the testimony on his own trial, he cannot be compelled to answer. (*The People* v. *Mather*, 4 Wend., 229, and cases there referred to.) This course of adjudication does not result from any judicial construction of the Constitution, but is a branch of the common law doctrine which excuses

The People *v.* Hackley.

a person from giving testimony which will tend to disgrace him, to charge him with a penalty or forfeiture, or to convict him of a crime. It is of course competent for the legislature to change any doctrine of the common law, but I think they could not compel a witness to testify on the trial of another person to facts which would prove himself guilty of a crime without indemnifying him against the consequences, because I think, as has been mentioned, that by a legal construction, the Constitution would be found to forbid it.

But it is proposed by the appellant's counsel to push the construction of the Constitution a step further. A person is not only not compellable to be a witness against himself in his own cause, or to testify to the truth in a prosecution against another person where the evidence given, if used as his admission, might tend to convict himself if he should be afterwards prosecuted, but he is still privileged from answering, though he is secured against his answers being repeated to his prejudice on another trial against himself. It is no doubt true that a precise account of the circumstances of a given crime would afford a prosecutor some facilities for fastening the guilt upon the actual offender, though he were not permitted to prove such account upon the trial. The possession of the circumstances might point out to him sources of evidence which he would otherwise be ignorant of, and in this way the witness might be prejudiced. But neither the law nor the Constitution is so sedulous to screen the guilty as the argument supposes. If a man cannot give evidence upon the trial of another person without disclosing circumstances which will make his own guilt apparent or at least capable of proof, though his account of the transactions should never be used as evidence, it is the misfortune of his condition and not any want of humanity in the law. If a witness objects to a question on the ground that an answer would criminate himself, he must allege, in substance, that his answer, if repeated as his admission on his own trial, would tend to prove him guilty of a criminal offence. If the case is so situated that a repetition of it on a prosecution against him is impossible, as where it is

forbidden by a positive statute, I have seen no authority which holds or intimates that the witness is privileged. It is not within any reasonable construction of the language of the constitutional provision. The term 'criminal case,' used in the clause, must be allowed some meaning, and none can be conceived other than a prosecution for a criminal offence. But it must be a prosecution against *him;* for what is forbidden is that he should be compelled to be a witness against himself. Now if he be prosecuted criminally touching the matter about which he has testified upon the trial of another person, the statute makes it impossible that his testimony given on that occasion should be used by the prosecution on the trial. It cannot, therefore, be said that in such criminal case he has been made a witness against himself, by force of any compulsion used towards him to procure, in the other case, testimony which cannot possibly be used in the criminal case against himself.

I conclude, therefore, that the relator was not protected by the Constitution from answering before the grand jury.

A similar question has been before the former Court of Chancery and the late Court of Errors. By the usury act of 1837, it was made a criminal offence to take usurious interest, and, by a provision of the same act, a plaintiff, in an action at law, brought on a contract alleged to be usurious, might be examined by the defendant as a witness to prove the usury, and the alleged usurer was likewise obliged to answer a bill of discovery on oath; but it was provided that neither the testimony so given, nor the sworn answer of the defendant in Chancery, should be used against the party who had so testified or answered, either before the grand jury, or on the trial of an indictment. (Ch. 430.) In *Perine* v. *Pixley* (7 Paige, 598), the defendant had demurred to the plaintiff's bill which was filed to enjoin proceedings at law on a note alleged to be usurious, and which required a discovery of the usury by the defendant's oath. The Chancellor considered the statutory provision, that the answer should not be used against the party, before the grand jury or on the trial of an indictment

against him, as an answer to the objection taken on the ground now under consideration; but the case was decided against the plaintiff on another ground. The case of *Henry* v. *The Bank of Salina* (5 Hill, 523; *S. C.*, in the Supreme Court, 1 id., 555), approaches very near to a judgment of the Court of Errors upon the precise point. On the trial, the defendant had offered to call the real plaintiff to prove the usury, in an action at law, pursuant to the act of 1837; though the plaintiff on the record was another person who had no interest in the demand. The main question was whether one for whose benefit the action was brought, but who was not the plaintiff on the record, was within the scope of the statute. The Supreme Court held he was not; and hence, that not having the protection of the statute, he could not be compelled to prove himself guilty of a misdemeanor. The judgment, which was for the plaintiff, was reversed in the Court of Errors; where it was held that a plaintiff in interest was within the statute, and that the Supreme Court had committed an error in not compelling the plaintiff to be sworn. Such a decision, of course, assumed that the statute requiring the plaintiff to be sworn, was constitutional on the ground that it afforded a sufficient protection to the plaintiff, who was thus compelled to be a witness. This would be entirely conclusive upon the point now under discussion, but for the fact first mentioned by the Chancellor, that the case did not disclose whether the usury, on account of which the defendant sought to avoid the note, had been actually taken, or only secured to be taken. If the latter was the case, he held that the usurer would not be indictable, as the section, of the statute creating the criminal offence, applied only to those who actually received the usurious premium. No protection would be required in such a case; at all events, the Constitution would not stand in the way. But the learned Chancellor added: " In the case now under consideration, I think the witness was compelled to testify, he being the real plaintiff, even if he had received a portion of the usurious premium so as to subject him to indictment under the act of 1837. And provided he

was not the real plaintiff, but a mere witness, he was bound to testify if he had made a usurious contract merely, without having actually received the usurious premium." None of the other members of the court spoke particularly of the point now in question; but the case, if not a precise authority, shows at least considerable weight of judicial opinion in favor of the judgment of the Supreme Court in the present case.

My conclusion is, that both the judgments appealed from ought to be affirmed.

All the judges concurring,

Judgment affirmed.