## MATTER OF CHOATE.

CRIMINAL CONTEMPT—JURY ROOM IS PART OF THE COURT.

The respondent in this matter, a reporter for a daily newspaper, secreted himself in the jury room while a criminal trial was in progress, for the purpose or overhearing and reporting the deliberations of the jury, which purpose he carried out. Upon being discovered by the jury, he was taken before the court, and although upon the request of the court he delivered up his notes of the proceedings of the jury, he refused to promise not to publish what he had heard, and did in fact publish it in a daily newspaper.—*Held,* that this was a criminal contempt.

A contempt may be committed in the immediate view and presence of the court, without being committed in the immediate view and presence of the judge.

The court is a totality of constituent parts, constituting all the entire judicial organization for the trial of causes, and it is immediately present whenever and wherever, from the opening to the adjournment of the sitting, those constituent parts are actually performing the functions devolving upon them by law.

Wherever the jury may be, so long as they are deliberating and performing the functions required of them by law, the court is there present, and a contempt then and there committed is contempt in the immediate view and presence of the court.

Motion to punish Dilworth Choate for criminal contempt of court.

The petition upon which the order to show cause why respondent should not be punished for criminal contempt of court, gives the facts of the case, and is as follows :

" First. That the defendants were indicted for the crime of conspiracy and were afterwards tried therefor in the court of oyer and terminer of the City and County of New York, before the Honorable GEORGE C. BARRETT, a justice of the supreme court, at the county court house in said city.

" Second. That on the 22d day of March, 1890, after the said justice had charged the jury, and they had retired for deliberation and consultation, a person was discovered by one of the jurors in said room in the attitude of listening, with paper and pencil in hand, apparently taking notes of what, if anything, he had heard.

" Third. That on said person being discovered by said juror in answer to a question " if he was a reporter " replied " we are everywhere," that he was thereupon arraigned in open court before his honor Mr. Justice BARRETT, and acknowledged that his name was Dilworth Choate ; that he was a newspaper reporter, that he had taken notes of what he had heard, and those notes he had secreted in his shoe, from which he took them in court and delivered them to the judge, and that he refused to promise, while under oath, that he would not from memory publish in any newspaper what he had overheard in the jury room.

" Fourth. That on the next day, the 23d of March, there appeared in print in a newspaper known as the ' World,' published in the city of New York, under the heading ' With the Flack Jury—A World reporter listens to their talk for two hours,' a statement purporting to be a report of the proceedings of the jury in this case during their deliberations while in retirement.

" Fifth. That the preceding statements are based in part upon the accompanying affidavits, and the record of the proceedings in court, at the time that said Choate was arraigned.

" Sixth. That the action and conduct of said Dilworth

Choate was contemptuous of the court, and directly tending to interrupt the proceedings, and to impair the respect due to its authority and to the administration of justice."

This petition closed with a prayer for an order to show cause, and was signed by all the counsel in the case.

The discovery of the intruder is thus described in the affidavit of Chas. A. Platt, one of the jurors:

"We had been out in the neighborhood of two and a half hours, and had just written a communication to Judge BARRETT, requesting some further instructions in regard to law, and while waiting for these instructions, the jurors were moving about the room, and had ceased their consultations. One of the jurors went up to and lounged around the bench, and I went up to speak to him, and, in passing the curtians behind the bench, it occurred to me to pull one of them aside, without any thought whatever, and on looking down I discovered what appeared to me, in the dim light, to be a wax hand holding a pencil. I naturally thought a hallucination was coming on my mind, or something of the kind, but I followed it up and saw that there was a man laid out there; and I at first thought it was a corpse. He was lying perfectly still, in order to conceal himself behind those curtains.

"As soon as I got my voice, after taking a good look at him, I saw by his pencil and notes that it must be a newspaper reporter, and I shouted out, 'Here is a reporter.'

"The jurors drew immediately around the bench, and the reporter got up on his feet, and said, 'We are everywhere.' That is the only thing he said. Mr. Bagley, a brother juror, immediately went to the door and knocked, and called one of the officers of the court, into whose hands we delivered this person.

"I had no knowledge, nor had any of my brother jurors any knowledge, of the presence of the reporter in the place where I discovered him, other than I have stated. No words of any kind passed between said reporter and myself,

or any of my brother jurors. He made but the one obser-
vation, which I have above given."

*Jno. R. Fellows,* district attorney, for the people, for
the motion.

*Frederick R. Coudert* and *Albert Reynaud,* for respon-
dent, in opposition.

BARRETT, J.—" It is a duty imposed upon all courts to
preserve order in court, and see to it that its proceedings are
not interrupted," said Judge MASON, in People *ex rel.*
Greeley against the Court of Oyer and Terminer (29 *How.*
18), " or that the respect and authority due to the court are
not impaired. And the statute to enable the court to dis-
charge this duty, confers the necessary power upon the
court."

In the matter at bar there is no substantial dispute as to
the character of the respondent's act. It was undoubtedly
a contempt. The principal question is whether such con-
tempt was committed during the sitting of the court, and in
its immediate view and presence. If it was so committed,
it is punishable as a criminal contempt, for it certainly tended
to interrupt the proceedings and to impair the respect due
to the authority of the court. The respondent's act was not
only a contempt, but an exceedingly gross violation of
professional propriety. He deliberately prepared for the
invasion of the jury room, secreted himself there in ad-
vance, and supplied himself with paper upon which to take
stenographic notes of what he might hear. He actually
took such notes while the jury were deliberating, and
although, upon his discovery, he delivered these notes to the
court, he refused to promise secrecy, and—notwithstanding
our admonition that his conduct was highly improper, and
that it was his bounden duty to keep what he had heard to
himself—he subsequently published his recollections of the
debate. " All this tended," to quote the language of FINCH,

J., in People *ex rel.* Munsell *v.* Court of Oyer and Terminer (101 *N. Y.* 249 ; 4 *N. Y. Crim. Rep.* 73) " to cast discredit upon the administration of public justice."

In State *v.* Doty (32 *N. J. Law R.* 403) the supreme court of New Jersey held that the law directs the complete seclusion of the jury, and that any attempt to invade such seclusion is illegal and a palpable violation of judicial authority. " The jury," said the learned and able Chief Justice BEASLEY, " cannot be isolated unless the court is prompt to punish those who infringe in the slightest degree the order directing such isolation. I think public policy requires that no one should escape punishment who is found in any respect invading the privacy of the jury room."

In this State, the statute expressly requires the jury, in criminal cases, while deliberating, to be kept together in some private and convenient place ; and the officers are sworn not to permit any person to speak to or communicate with them, nor to do so themselves, unless it be by order of the court (*Code Crim. Pro.* § 421). The conduct of the respondent was a deliberate violation of the statute, and of those just principles which, from time immemorial, have been established to secure the independence and impartiality of jurors.

The question remains whether this plain contempt was committed in the immediate view and presence of the court. It certainly was committed during the sitting of the court. The sitting of the court was continuous while the jury was deliberating. There was no adjournment or suspension of the sitting. The judge was actually upon the bench in the court room during the earlier part of these deliberations. Later on, the judge retired to the judges' chambers, in the same building and on the same floor with both the court room and the jury room. But the court was at all times in session and remained so until after the rendition of the verdict. The contempt was not committed in the immediate view and presence of the judge. The judge, however, is not the court. A court has been well defined to be " an organized

body, with defined powers, meeting at certain times and places for the hearing and decision of causes and other matters brought before it, and aided in this, its proper business, by its proper officers, viz., attorneys and counsel, to present and manage the business, clerks to record and attest its acts and decisions, and ministerial officers to execute its commands and secure due order in its proceedings." *Burrill's Dictionary.*

Lord COKE describes it to be "a place where justice is judicially administered." Referring to this definition Mr. Waite (*Prac.* vol. 1, p. 221) says that the term "place" must be understood figuratively, for a court is properly composed of persons consisting of the judge or judges and other proper officers, united together in a civil organization and invested by law with the requisite functions for the administration of justice.

This is a correct view of the subject. The court is clearly an organization invested by law with certain functions for the administration of justice. A contempt committed in the immediate view and presence of any constituent part of that organization, during the sitting of the court, and tending to interrupt the proceedings of such constituent part, is a contempt in the immediate view and presence of the court. This was expressly held in Bergh's case (16 *Abb. N. S.* 284). The particular act there under consideration was the delivery to the grand jury of an aspersive letter from an unofficial person. This was deemed contemptuous behavior committed during the sitting of the court. "I think," said the learned recorder, "that the term 'behavior' may cover the writing and delivery to the grand jury of a contemptuous and insulting letter. It is clear, from the elementary writers, and from what the Court of Appeals implied in the Hackley case (24 *N. Y.* 78), that the grand jury room is an enlargement of the court room and part of the court sitting. Handing to the petit jury, a letter containing remarks upon the case pending before them, has been at *nisi prius* adjudged a contempt; the jury for convenience

being outside of the court room proper, it is true, but legally and technically, nevertheless, a part of the court sitting; and both the grand and petit jury rooms were merely extensions of the court apartment, and are under equal jurisdiction."

In Commonwealth v. Crans (3 *Pa. L. J.* 453) the court said it was " clear that a grand jury are as much attached to the court as a petit jury. . . . In contemplation of law a grand jury are supposed to be personally present in court; . . . they differ from a petit jury only in this particular—the latter hear both sides of the case, but both receive legal information from the same tribunal."

Mr. Rapalje, in his work on Contempts, sec. 67, says that the grand jury, being merely an appendage to the court, the refusal by a witness to answer questions put by them is a contempt of the court by whose order the grand jury was impaneled. For this proposition he cites many cases in this and in other States, notably People v. Naughton (7 *Abb. N. S.* 421); People v. Kelly (24 *N. Y.* 74); and People v. Fancher (4 *T. & C.* 476).

In People v. Naughton, Mr. Justice Pratt held that the grand jury was a constituent part of the court of oyer and terminer, and that its proceedings were a part of the proceedings of that court (See p. 423).

In People *ex rel.* Hackley v. Kelly (21 *How.* 54), the supreme court of this department at General Term held that the grand jury was an adjunct of the court as well as the petit jury. It was there insisted that the commitment was illegal because the contempt did not occur in the presence of the court, but in the grand jury room before the jury as an independent body. Leonard, J., answered this contention by saying that " When summoned, sworn and organized the grand jury are a constituent part of the court for the performance of the functions and duties developed upon the court, as much as a body of twelve petit jurors impaneled for the trial of a person charged with crime. . . . When the witness has been brought before the grand jury

to testify, he is for the time in the custody or under the control of the court and the grand jury. He stands in the same relation to the court as a witness on the stand before the court and a petit jury."

It will be observed that the reasoning in many of these grand jury cases proceeds upon the analogy to the petit jury. That the latter body is directly and immediately a constituent part of the court, and the petit jury room an adjunct to the court, is treated throughout as a postulate admitting of no question. This becomes entirely clear when we free our minds from the popular notion that the judge is the court. He is a constituent part of the organization, but he is not the court. Nor is the court-room the court, nor the jury-room, nor the petit jury. The court is the totality of the constituent parts. It consists of the entire judicial organization for the trial of causes, and it is immediately present whenever and wherever—from the opening to the adjournment of the sitting—these constituent parts are actually performing the functions devolving upon them by law.

If the judge happens to leave the bench and the court room for a few moments, while counsel is summing up to the jury, and during his absence an assault is made upon the speaker, can there be a doubt that a criminal contempt is thereby committed? This is not because the act is done in the court-room, but because it is done in the court. The court is in session and present, though the magistrate is temporarily absent. And further, the jury may decide in the court-room in the presence of the judge, or they may retire to another room to deliberate, or they may even be left in the privacy of the court-room itself—all persons in the latter case, including the judge, being excluded. Wherever they may be, so long as they are deliberating and performing the functions required of them by law, the court is there present, and a contempt then and there committed is committed in the immediate view and presence of the court.

This conclusion is in precise accord with the view taken by the supreme court of the United States of the Federal statute relating to contempts. In the Matter of Savin (131 *U. S. Reports*, 267), the court examined the question as to when and where a court may be said to be present, and the opinion of Mr. Justice HARLAN seems to be directly in point. " We are of opinion," said that learned judge, " that, within the meaning of the statute, the court, at least when in session, is present in every part of the place set apart for its own use, and for the use of its officers, jurors and witnesses; and misbehavior anywhere in such place, is misbehavior in the presence of the court. It is true that the mode of proceeding for contempt is not the same in every case of such misbehavior. Where the contempt is committed directly under the eye or within the view of the court, it may proceed upon its own knowledge of the facts and punish the offender without further proof and without issue or trial in any form (*Exp.* Terry, 128 *U. S.* 289, 309); whereas, in cases of misbehavior of which the judge cannot have such personal knowledge, and is informed thereof only by the confession of the party or by the testimony under oath of others, the proper practice is by rule or other process to require the offender to appear and show cause why he should not be punished (4 *Bl. Com.* 286). But this difference in procedure does not affect the question as to whether particular acts do not, within the meaning of the statute, constitute misbehavior in the presence of the court. If, while Flores was in the court-room waiting to be called as a witness, the appellant had attempted to deter him from testifying on behalf of the government, or had there offered him money not to testify against Goujon, it could not be doubted that he would have been guilty of misbehavior in the presence of the court although the judge might not have been personally cognizant at the time of what occurred. But if such attempt and offer occurred in the hallway, just outside of the court-room, or in the witness-room where Flores was waiting, in obedience to the subpœna served upon him or

pursuant to the order of the court, to be called into the court-room as a witness, must it be said that such misbehavior was not in the presence of the court? Clearly not."

The case of People *ex rel*. Munsell *v*. Court of Oyer and Terminer (101 *N. Y*. 245 ; 4 *N. Y. Crim. Rep*. 70), does not conflict with these views. It was there conceded that the respondent's act was not a criminal contempt, as such contempts are defined in the Code of Civil Procedure (§ 8). It was, however, an exceedingly dangerous contempt, and should be enumerated among the criminal contempts, for the act would probably have entitled the defendant to a new trial in case of conviction (*Code of Crim. Pro*. § 465, subd. 2). If the verdict in that case had been the other way, the defendant, under the reasoning of the court, could doubtless have secured the juror's punishment as for a civil contempt. But his misconduct was not committed in the presence of the court or in the presence of any of its constituent elements. It was entirely outside of and apart from the court and its judicial machinery. It consisted in the juror's visiting the scene of the affray unaccompanied by his fellows, and without the order of the court. Such an act was not enumerated among criminal contempts, and the statute expressly limits the power to punish *ex proprio motu* to such enumerated contempts. The court held that the act was not even a civil contempt which the people could punish, because the people had not suffered in their pecuniary interests. But, as previously observed, the defendant, if put to expense by the necessity for a new trial, might have invoked the statute as to civil contempts. The case is certainly not in point as to the question now under considereration, and does not in any wise affect the present conclusion. That conclusion is that the respondent was guilty of a criminal contempt, and that such contempt was committed in the immediate view and presence of the court.

It follows that a commitment should issue. As to the extent of the punishment, I apprehend there can be no question. The maximum authorized by statute is wholly

inadequate. The offense, as we have seen, was a grave one. It evinced a total disregard of what is due to the people in the decent and orderly administration of justice. No repentance has been exhibited, no apology offered, no expression of regret vouchsafed. The determination has been to do the wrong, to do it deliberately, and to persist in it defiantly.

The respondent is committed to the county jail for thirty days, and a fine is imposed of $250.

### NOTE ON CRIMINAL CONTEMPT.

In addition to the cases cited in the opinion of the court, the following decisions are of interest :

When a party is guilty of a contempt of a circuit court by using insulting language to the judge while holding court, he may be punished therefor without any rule being issued against him, and in such case the judge may act on his own knowledge of what has been said, and absolutely refuse to hear any other evidence as to the language used by said party. But if the contempt of the court was by using insulting language about the judge, not in the court-room, but elsewhere, and not in the presence of the judge, a rule should be issued against the defendant, and he should be allowed to prove by witnesses the language he actually used; and, if denied these privileges, the judgment against him will be reversed in the appellate court. State v. Gibson (W. Va.), 10 *So. East. Rep.* 52.

It is a criminal contempt to strike a defendant in the lobby of the court after the trial. Rex v. Weigley, 32 *Eng. Ch. L.* 415.

It is a criminal contempt for an acquitted prisoner to threaten vengeance against witnesses within the precincts of the court. U. S. v. Carter, 3 *Cranch C. C.* 423.

A court is not dissolved by mere recess or necessary adjournment from one day to the next, and misbehavior affecting public justice in the court-room, and in the immediate presence of the judge, while he is attending there to resume business when the hour of recess expires, is misbehavior in the presence of the court, and may be punished summarily as a contempt, especially if the contempt is by a suitor who has called attention to a pending case and is discussing it in the presence of some of the jurors who may have to try it. Baker v. State of Georgia, 9 *S. E. Rep.* 743 ; 4 *Law Rep.* 128.

In Ohio, the statute gives the judge summary power to punish for misbehavior in the presence of or " so near the court or judge as to

obstruct the administration of justice." In a case in that State, it was held, that the furnishing by a correspondent for publication, and procuring to be published in a newspaper an article containing statements regarding a judge who was engaged in the trial of a case, imputing to him conduct in respect to such case which, if true, would render him an unfit person to preside at such trial, with knowledge on the part of the correspondent that the paper has a large circulation in the county where the trial is in progress, and has reasonable ground to believe that it will, when published, be circulated in the court-room, and about the court-house during the trial, and there read, and which was afterwards, during the trial circulated and read therein, is in contempt of court, and may be punished summarily under the statute already referred to. Myers v. State, 46 *Ohio St.* 475.

An officer's failure to produce the body of the prisoner in obedience to a writ of *habeas corpus*, when he has the power to do so, is a contempt committed *in the face of* the court, and no affidavit of the facts or order to show cause is necessary to authorize the court to commit him. Matter of Sternes, 77 *Cal.* 158; 11 *Am. St. Rep.* 251.

As to what forms part of the court, a recent English case of civil contempt is of interest. In that case, after the hearing of an application before the judge in chambers, a solicitor who was engaged in the case, after the parties had left the judge's chambers, and gone into the adjoining hall, began to call the solicitor for the other side foul and offensive names in connection with the proceedings before the judge, and continued doing so while going downstairs until they reached the entrance to the building, when he shook his fist in the other solicitor's face, though he did not actually strike him.—*Held*, that this conduct was an interference with the administration of justice in connection with the proceedings at chambers, and that the judge in chambers was engaged in the exercise of his judicial functions as a judge of the high court. The conduct was contempt of the court of which the judge was a representative, and the court had power to commit for contempt. *In re* Johnson, 20 *Q. B. D.* 68.