THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* ABRAHAM FINKEL, Defendant.

Supreme Court, New York County, Extraordinary Special and Trial Term, December 23, 1935.

*Thomas E. Dewey* and *Edward C. McLean, Deputy Assistant District Attorneys,* for the plaintiff.

*Haskell Jacobs,* for the defendant.

McCook, J. Defendant is charged with criminal contempt. After being examined by a district attorney in the latter's office, he was taken before the grand jury of the Extraordinary Special and Trial Term of this court sitting for the investigation of rackets, and more particularly considering the activities of persons controlling a certain organization known as the Metropolitan Restaurant and Cafeteria Association, the alleged commission of extortion by those persons, and the alleged illegal relationship existing between

that organization and certain labor unions. He was there questioned during five separate sessions. His testimony occupies about 250 pages of the record, exclusive of exhibits.

On December nineteenth he was brought before the court, the grand jury minutes and exhibits were received in evidence and specifications of the charges were read aloud to him. Since he expressed a desire to consult counsel, the hearing was postponed until December twentieth; he was given a copy of the grand jury minutes, and read them over night. On December twentieth he appeared again, accompanied and represented by counsel, was given an opportunity to explain his conduct, took the stand voluntarily, was sworn and was examined for more than an hour upon the specifications and the record by his counsel and the district attorney. He failed to give any reasonable explanation, except that he had been " fishing for answers, " or to add to the so-called information given to the grand jury. Counsel were afforded further time to furnish briefs and have done so.

In such a summary proceeding as this the court must consider the face of the record. (See cases later cited.) It is, therefore, necessary to discuss what happened before the grand jury at some length.

The defendant witness' point of view immediately appears: " Q. Now, what books and records that were called for by the subpœna didn't you produce? A. Just voucher checks and check books. Q. For what period? A. Well, from the time I opened until April, 1935 * * *. Q. Where are these missing records? A. I don't know. Q. Haven't you any idea? A. No, sir. Q. Is that your best testimony? A. Yes. * * *. (A general ledger was marked ' Exhibit 1 ' and a cash book ' Exhibit E.') Q. Now, when you were questioned about these entries by Mr. McLean (a deputy district attorney) on Friday, did you tell the truth? A. No. Q. You lied to Mr. McLean? A. Not that I exactly lied, I told him that I didn't know off hand what they were. Q. Did you tell the truth? A. No. Q. Did you know at that time what the correct answers were? A. Yes. Q. But you didn't tell Mr. McLean what the correct answers were? A. That is right. Q. Why didn't you tell Mr. McLean the truth? A. I wasn't under oath. Q. The only time you tell the truth is when you are under oath? A. That is right. Q. On other occasions you lie? A. Not necessarily. * * * Q. And you knew you were being questioned by a public official. A. That is right. Q. And about a matter that was of public importance? A. That is right. Q. And you deliberately lied, is that right? A. Yes. Q. And you knew you were misleading the District Attorney? A. That is right. Q. About a

matter which you knew was the subject of official investigation; is that right? A. That is right. Q. When did you decide to tell the truth? A. Over the week end. Q. Now, what happened over the week end? A. Nothing. Q. Did you see anybody? A. No."

The main subject of inquiry was an expenditure of $1,500 in June, 1934, recorded in the books of the corporation, of which he was an officer and principal owner, Empire System, Inc., under the heading "Association Dues." He testified he paid this amount to a person known to him only by the name of " Jack," never before seen by him and not introduced to him by any other person, and that he did so in order to avoid " labor trouble." After saying that " Jack " told him that he " was a man that was connected with the union " and being asked " what union " he replied " 302," that is to say Local 302, Cafeteria and Delicatessen Employees Union. Subsequently, however, he changed that testimony and insisted that " Jack " had not told him the specific union with which he was connected and that he had no knowledge as to what union the man purported to represent. He continued to maintain that he possessed no additional information whatever as to the identity of " Jack " or the latter's ability to provide the " protection " for which " Jack " was being paid. This alleged ignorance is thrown into high relief by his admission that on a previous occasion, in 1930, he had paid $1,000 to an unidentified person under threat of having a stink bomb thrown in his restaurant, although within a short time afterwards such a bomb was actually thrown, so that the payment was ineffective.

His testimony as to the date of the $1,500 payment is equally significant: first, that it was about June 10, 1934, next that it might have been anywhere from June 10 to June 15, 1934; finally reverting to June tenth. After repeated cross-examination, he was reminded that according to the books, the money used was not received by the corporation until June 13, 1934, but still contended for an earlier payment and ended by testifying flatly that the date of June thirteenth in the corporate books was erroneous and purely arbitrary.

By the way, he admitted without any evidence of shame that the many false entries to which he confessed were made by his accountant at his own express direction.

This may be regarded as typical of the attitude adopted by the defendant witness throughout his entire examination on every subject, for example, the important one of the source of the money allegedly taken from a safe deposit box to be paid to " Jack." Here are the positions successively taken by the witness:

(1) Between $1,500 and $2,000 withdrawn from the East New

York Savings Bank account in 1932 or 1933, the transcript of account showing (last substantial) withdrawal of $1,975 on August 27, 1932. This he maintained was the money placed in the safe deposit box.

(2) On August 27, 1932, $3,750 was allegedly paid as his part of a deal with the Irving Trust Company. This money he claimed came from a Bowery Savings Bank account. The Bowery account shows a withdrawal of only $1,775 at that time, leaving $1,975 to be accounted for.

(3) His next explanation was that the $1,975 " probably " came from his wife's account at the Williamsburg Savings Bank, admittedly his only other possible source of supply. However, that account shows no withdrawals in 1932.

(4) He then said the cash allegedly in the box came from his business, but the bank account of his corporation carries a *deposit* of $3,750 on August 27, 1932, and a withdrawal on the same date of $4,250 supported by the Irving Trust Company receipt (in evidence) in that amount on that day.

(5) Again pressed as to the source of the missing $1,975, he said he must have obtained part of it from his partner, one Klugsberg, now deceased.

His testimony on these financial matters, which was of such a nature as to permit contradiction by documentary proof, demonstrates the manner in which he retreated from evasion to evasion, from falsehood to falsehood, until finally forced to take refuge behind a dead man.

A payment of $100 on June 14, 1934, was the subject of another inquiry. As to this, he offered at least three explanations, continuously denying that the payment had relation to any association, although it was charged on the books to " Cash Association Dues." First it was stated to be part of moneys expended for construction, materials and labor, then that it was employed in connection with the construction of his store, then that it was used to pay tips to workmen, although no reason was offered for concealing such a legitimate item under a false heading. He ended by saying that he did not know for what purpose it had been used.

Another inquiry concerned $150 recorded in the same book and under the same heading. He changed his testimony in this regard at least seven times, stating first that it was salary and recorded under a fictitious heading to defraud the government of income taxes. Next, he withdrew this explanation, characterizing it as false. Next, he said that he did not know what the explanation was. Next, that it was paid for miscellaneous expenses. Next, that it was used for tips to workmen. This testimony in turn was

withdrawn and he again testified he did not know for what the money was spent, but later he returned to tips and concluded that at least part had been paid to a carpenter named "Max." On only one point did he profess to be certain, namely, that neither this payment, nor any other identified on the books as "Association Dues" upon which he was interrogated had anything to do with an association.

A recorded expenditure of $105 on June 15, 1934, under the same heading, "probably might have been given" to the Metropolitan Restaurant and Cafeteria Association; almost immediately he hedged and professed not to know what the money was spent for. He finished by asserting that it was not paid to the association and that the entry was false, with the ultimate suggestion that it might represent purchases at an auction sale. Only after repeated questioning on the important subject of the date of his joining the association, did he again change his testimony and admit that this particular payment was in fact made to the Metropolitan Restaurant and Cafeteria Association.

He testified that he joined the association in June, 1934, and that his sole purpose was "to be a member of that organization;" that he did not know what its activities were when he joined; that he did not find out; that he expected nothing for the money paid, which admittedly amounted to an initiation fee of $250 and $5 a week dues, and that he was making merely a "voluntary contribution." After hinting at certain benefits, which he later disclaimed, he admitted squarely that the only occasions of calling on the association for assistance, and the only assistance received from it, were in connection with the settlement of a labor trouble.

In spite of the admission already referred to, that the $105 marked "Association Dues" upon his books under date of June 15, 1934, had actually been paid to the association as part of the initiation fee, he long maintained that this date was inaccurate and that he had not joined at that time. Only when shown a transcript of his corporation's bank account, to the effect that this particular check had been paid by the bank June 18, 1934, did he admit that in this instance his books were accurate and that he had actually joined June fifteenth.

He was similarly unable it seemed to explain in any reasonable way either of two entries in October, 1934, each for $100 and labeled, respectively, "Bakers Union" and "Cash Union."

The date of joining the association is important chiefly to show its relation to the date of the $1,500 paid to "Jack;" since this money was not received by this defendant's corporation until June

thirteenth, it is apparent that joining the association and paying " Jack " must have been simultaneous, or almost simultaneous acts. Whether he remembered the exact dates or not, he must have been well aware of the relation between them, and yet until driven to change by the pressure as to one item of documentary proof, he repeatedly maintained that the two events were at least two weeks apart. Indeed, until the end of the examination, and obviously because he was shown no documentary evidence which entirely refuted him, he maintained that there was no connection between the two events, that he paid the money to " Jack " without any knowledge as to his identity, and that he joined the association for no reason at all.

The items of time, place, money, receipts and payments, lost vouchers and false entries, as well as the identity of the extortioner, and the various business associates so described but unnamed, taken separately and in relation to one another, are seen to be highly material to the subject-matter of this particular investigation and of the greatest importance to the investigation as a whole.

People's Exhibit 1 of December nineteenth (the stenographic minutes) supplies sweeping and unmistakable evidence that the witness began his testimony determined to deceive and mislead the district attorney, the grand jury and the court; that he never wavered in his effort to do so; that he lied whenever convenient or possible, and told the truth only when compelled to do so by facts which could not be dodged; that he was persistently evasive, contumacious and contemptuous, and that his testimony as a whole was incredible.

The simplest form of obstructing justice is to refuse to answer a proper question. Another form is to assert failure of memory when there is in fact no such failure. A third is to profess at all times that one has nothing to conceal and is telling the truth, but to pretend to forget or to pretend to remember what is not so, whichever may be handiest at the time, to lie when one can, to tell the truth when one must, and by glibness and insolence waste more time than would be possible under either of the other methods.

It is an interesting technique — also a dangerous one. If it can be employed with impunity, it is likely to spell the end of any attempt to procure evidence of organized and lucrative crime in which normally well-disposed citizens have become involved on a large scale through cupidity, timidity or passivity.

There is a remedy. The Federal authorities have unmistakably expressed themselves to the effect: " That the contumacious refusal of a witness to testify may so directly obstruct a court in the performance of its duty as to justify punishment for contempt is

so well settled as to need only statement." (WHITE, Ch. J., in *Ex Parte Hudgings*, 249 U. S. 378, 382.) And again (at p. 383): "An obstruction to the performance of judicial duty resulting from an act done in the presence of the court is, then, the characteristic upon which the power to punish for contempt must rest." Also in the case of *United States* v. *McGovern* (60 F. [2d] 880 [C. C. A. Second Circuit, 1932], at p. 889), CHASE, J., said: "A wily witness who avoids the danger of a blunt refusal to answer by mere lip service to his duty and conceals the truth by the use of words may be as obstructive as his fellow of less mental agility who simply says nothing." The proposition has been forcefully stated in *United States* v. *Appel* ([D. C. S. D. N. Y. 1913] 211 Fed. 495), where the court, L. HAND, J., said (at pp. 495, 496): " The power of the court to treat as a criminal contempt a persistent perjury which blocks the inquiry is settled by authority in this circuit. [Citing cases.] It is indeed impossible logically to distinguish between the case of a downright refusal to testify and that of evasion by obvious subterfuge and mere formal compliance. The rule, I think, ought to be this: If the witness' conduct shows beyond any doubt whatever that he is refusing to tell what he knows, he is in contempt of court. That conduct is, of course, beyond question when he flatly refuses to answer, but it may appear in other ways. A court, like any one else who is in earnest, ought not to be put off by transparent sham, and the mere fact that the witness gives some answer cannot be an absolute test. For instance, it could not be enough for a witness to say that he did not remember where he had slept the night before, if he was sane and sober, or that he could not tell whether he had been married more than a week. If a court is to have any power at all to compel an answer, it must surely have power to compel an answer which is not given to fob off inquiry."

In the State courts a closer analysis of the decisions may be advisable. To begin with *People ex rel. Greeley* v. *Court of Oyer & Terminer* (27 How. Pr. 14, 18) (MARVIN, J.): " It is a duty imposed upon all courts to preserve order in court, and see to it that its proceedings are not interrupted, or that the respect and authority due to the court are not impaired."

In *People ex rel. Petrucci* v. *Hanley* (121 Misc. 624) the court (DAVIS, J.) said (at p. 626): " If the witness truthfully stated that he could not remember, it would be a sufficient answer to the inquiry, but if he gave that response when in fact he did remember, it is not an answer and such a response under the circumstances would amount to a contempt. And when the magistrate (CRAIN, J.) after a consideration of all the accompanying circumstances, including the demeanor of the witness on the stand, comes to the

deliberate conclusion that the witness does remember, notwithstanding his denial of recollection, his decision upon that question ought not to be disturbed."

For an illuminating discussion of contempt as applied to supplementary proceedings, see *Matter of Becker* v. *Gerlich* (72 Misc. 157) where the court (GIEGERICH, J.) said (at p. 159) in part as follows: " Many of these answers, and many others in which more or less definite answers were given, were transparently false, and the examination cannot be read without the conviction that the judgment debtor was wilfully evading the questions by a disclaimer of knowledge or recollection. It has been decided that false swearing upon an examination in supplementary proceedings is not punishable as a contempt [citing case]. But where the judgment debtor, unwilling to testify truly and fearing to give false testimony as to his acts or transactions, resorts to the expedient of denying knowledge or recollection concerning them, thus rendering a prosecution for perjury difficult, if not impossible, it by no means follows that he must be held to be equally beyond the reach of this court. I should be sorry to hold that he was, and so to confess that by a palpable and transparent evasion the fraudulent debtor had put himself safely beyond the reach of the civil process of this court and at the same time for all practical purposes beyond the reach of the criminal law. On the contrary, I think that in a perfectly plain case where the debtor wilfully denies knowledge or recollection of matters concerning which he is properly questioned, and concerning which it is incredible that he should have wholly forgotten, the court may punish him as for a civil contempt not because he has testified falsely in denying such knowledge or recollection, but because he has in effect refused to testify at all."

There can be no question that the conduct of this witness before the grand jury was the subject-matter of contempt. (See *People* v. *Hackley*, 24 N. Y. 74, 78 [DENIO, J.].) " But I am of the opinion that the statute applies to the refusal of a witness to answer a legal question put to him by the grand jury to the same extent as though he were called to give testimony on the trial of an issue before the court or a petit jury." (See, also, *People ex rel. Choate* v. *Barrett*, 56 Hun, 351; affd., 121 N. Y. 678.)

We now pass to two cases which have caused considerable difference of opinion with respect to, similar problems and have, we think, been sometimes misunderstood.

*People ex rel. Falk* v. *Sheriff of New York County* (258 N. Y. 437) is distinguishable on four plain grounds: (1) The dignity of the legislative committee and not of the court was the subject of the alleged contempt; (2) " upon the record now before us, the untruth-

fulness of the answer may be a possible inference, but a necessary one it certainly is not " (p. 439); (3) " the proceeding in which he has been committed is not in the strict sense a proceeding to ' punish ' for a contempt at all but one in aid of the Legislature to enforce the duty to answer a pertinent inquiry by keeping the witness in jail till the answer has been supplied " (p. 439); (4) " when once that is done, he is entitled to his discharge, though there was evasion or deceit in setting up the claim of privilege whereby an answer was delayed " (p. 440). Since in our case the witness defendant raised no claim of privilege but waived immunity, obviously no question of constitutional rights is involved.

*Matter of Foster* v. *Hastings* (263 N. Y. 311). There are expressions in the opinion of the court in this case which might on their face look in a direction contrary to the conclusions heretofore reached. It must be noted, however, that the testimony there under examination was given in supplementary proceedings and that the offense of which the defendant was found guilty was a civil, not a criminal contempt, and the subject-matter was perjury, not evasion. This renders that case also, in my opinion, distinguishable. To make his appreciation of the distinction certain, POUND, Ch. J., quotes with approval *United States* v. *Appel* (211 Fed. 495). He specifically says (at p. 314): " Nothing on the face of the judgment debtor's evidence indicated that it was false. Nothing suggests that it was not a *bona fide* effort to answer the questions."

I hold that the conduct of the defendant is the equivalent of a continued contumacious and unlawful refusal to answer legal and proper interrogatories, that it has interrupted the court's procedure and impaired the respect due to its authority (Judiciary Law, § 750) and that it constitutes a criminal contempt of court.

Defendant is sentenced to confinement in the city prison for thirty days.