O'CONNELL v. UNITED STATES.*
No. 185.

Circuit Court of Appeals, Second Circuit.
April 7, 1930.

*Certiorari granted 50 S. Ct. 461, 74 L. Ed. ——.

MANTON, Circuit Judge, dissenting.

James I. Cuff, of Brooklyn, N. Y., Joseph L. Delaney, of Albany, N. Y., and David V. Cahill, of New York City (Joseph A. Murphy, of Albany, N. Y., of counsel), for appellant.

Charles H. Tuttle, U. S. Atty., of New York City (Thomas T. Cooke, Asst. U. S. Atty., of New York City, of counsel), for the United States.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

SWAN, Circuit Judge (after stating the facts as above).

■■ The power summarily to punish for contempt extends to misbehavior in the presence of the court "or so near thereto as to obstruct the administration of justice." Rev. St. § 725, 28 USCA § 385; Ex parte Savin, Petitioner, 131 U. S. 267, 9 S. Ct. 699, 33 L. Ed. 150. Whether witnesses before the grand jury are to be deemed within the court's presence, as seems probable from Savin, Petitioner, or within the "so near" clause, we need not decide. In either event their recalcitrancy may be dealt with summarily. It is true that what occurs within the grand jury room is not under the eye of the judge, and hence the court cannot forthwith mete out punishment based wholly upon its own knowledge, as in Re Terry, 128 U. S. 289, 9 S. Ct. 77, 32 L. Ed. 405. It must be informed of the alleged contempt, and the contumacious witness must be advised of the charge against him and have adequate opportunity for explanation and defense; but nothing more is necessary. As said by Chief Justice Taft in Cooke v. United States, 267 U. S. 517, 537, 45 S. Ct. 390, 395, 69 L. Ed. 767:

"Due process of law, therefore, in the prosecution of contempt, except of that committed in open court, requires that the accused should be advised of the charges and have a reasonable opportunity to meet them by way of defense or explanation. We think this includes the assistance of counsel, if requested, and the right to call witnesses to give testimony, relevant either to the issue of complete exculpation or in extenuation of the offense and in mitigation of the penalty to be imposed."

■ Measured by this test, the appellant's objection to the form of the proceeding which resulted in his commitment, cannot prevail. Either a written presentment by the grand jury, as in Blair v. United States, 250 U. S. 273, 39 S. Ct. 486, 63 L. Ed. 979, or an oral presentment, as in Wilson v. United States, 221 U. S. 361, 31 S. Ct. 538, 55 L. Ed. 771, Ann. Cas. 1912D, 558, will suffice to bring the alleged contempt before the court. The appellant was present and represented by counsel when the oral presentment was made to the District Court. Hence no citation or order to show cause was necessary. He was fully advised of what the proceeding was; he asked for no additional time to prepare for defense; he raised no question as to the accuracy of the testimony read in open court, and made no request that more of it be read, or that witnesses be called. His counsel demanded only that the prosecution specify the questions and answers upon which he was being held in contempt, "so that we may have the matter litigated in the proper court," which meant, we suppose, on appeal. To this the court responded that the order was based on the completely evasive conduct of the witness in not answering or in evading the answers to the numerous questions which had been read by the United States attorney, and, on being further pressed for specification said, "I base it on the entire proceedings." The only question of procedure, therefore, is whether refusal of a more detailed specification was prejudicial error.

■ The prosecutor's oral statement to the court charged the witness with contumacy of two sorts: The giving of evasive and obstructive answers, and the refusal to answer, on the ground of constitutional privilege, when his answers could have no direct tendency to incriminate him. Contumacy of the first sort will seldom appear from a single answer or from a small portion of a witness' testimony. Only by considering a large number of questions and answers will obduracy of this character usually become apparent. It is the constant repetition of "I can't remember" in

respect to matters of which the witness must in all likelihood have recollection, and a comparison between his ability to testify as to some matters and his failing recollection as to others, that raises the inference of an intentional refusal to assist the inquiry. To have required the prosecutor to specify only part of what he had read would not have made the charge more specific; it would simply have limited the evidence he offered to sustain it. As to contumacy of the second sort, the witness had already received two previous warnings from the court, and the questions which were the immediate occasion of the presentment, namely, whether he knew Malloy and the location of Malloy's place in Albany, were identical in type with those the court had previously directed to be answered. We do not say that, had the witness offered to purge himself and asked for instructions as to what he must do, it might not have been necessary for the court to pass in detail upon the questions he should answer. But his request for specification was not made for that purpose; nor was it necessary in order that he might be informed of the charge against him. The prosecutor had at the outset definitely stated that the witness was charged with intentionally obstructing the grand jury's inquiry by evasive answers and by refusal to answer under a premature claim of constitutional privilege. Under these circumstances we see nothing prejudicial in the court's refusal to specify the particular questions and answers upon which O'Connell was held in contempt. The refusal is attacked as a denial of due process, but nothing is advanced to indicate that it deprived the appellant of an adequate opportunity to make a defense, had he desired to make one.

■ The appellant's second point is that the evidence does not support the judgment of contempt, first, because the reading by the United States attorney of the transcript of testimony was not legal evidence of what happened before the grand jury; and, second, because, if it were legal evidence, it would not establish a contempt of court. As to the first branch of the argument, it is a sufficient answer that appellant, with his counsel, and the grand jury were present, and no objection was made to the character of the proof, no question raised as to the accuracy of the transcript, and no opportunity requested to refute what was alleged against him. The whole proceeding assumed that the witness conceded the accuracy of the account of what had transpired before the grand jury, as he had on the previous hearing. If the manner of presenting the facts to the court was informal, it is clear that appellant assented to the informality. People ex rel. Hackley v. Kelly, 24 N. Y. 74, is precisely in point.

■■ As to the second branch of the argument, the refusal to answer certain questions under the claim of privilege will first be examined. Here only questions as to which the privilege was claimed need be considered. The grand jury was investigating a lottery, a subject within its jurisdiction as lotteries almost always involve some use of the mails. 18 USCA § 336. The questions asked were apparently relevant, or at least were a proper introduction to further inquiries, which might elicit information that would lead to prosecution of crime. The appellant was not privileged to refuse to answer unless his answer would have a direct tendency to incriminate him; a remote or speculative possibility of danger is not enough. Mason v. United States, 244 U. S. 362, 37 S. Ct. 621, 61 L. Ed. 1198; United States v. Sullivan, 274 U. S. 259, 264, 47 S. Ct. 607, 71 L. Ed. 1037, 51 A. L. R. 1020. Many of the questions were merely whether he was acquainted with certain persons, who presumably were thought by the grand jury to have some connection with the pool. An answer of "Yes" or "No" to such questions could have no direct tendency to incriminate him. The danger was much more remote than in Mason v. United States, supra. He claimed his privilege in response to some twenty-five questions. They were all innocuous, except, perhaps, those relating to whether he had placed bets through the Albany pool. If those be excluded, and also questions which he answered after direction by the court on the prior hearing, there are still plenty left of a type which he could not refuse to answer, as the court had already explained to him. His persistence in prematurely claiming the privilege and refusing to answer well justified a finding of contumacy.

■ His contumacy was further established by the character of his responses to questions to which he did make formal answer. Since Ex parte Hudgings, 249 U. S. 378, 39 S. Ct. 337, 63 L. Ed. 656, 11 A. L. R. 333, we have held that, though a witness make formal answer, it may be apparent that he is withholding the truth, and that such obstruction of justice may be punished as contempt even if it be also perjury. Loubriel v. U. S. (C. C. A.) 9 F.(2d) 807. See, also, In re Schulman, 177 F. 191 (C. C. A. 2); In re Kaplan Bros., 213 F. 753 (C. C. A. 3); Haimsohn v. United States, 2 F.(2d) 441 (C.

C. A. 6); United States v. Karns, 27 F. (2d) 453 (D. C. N. D. Okl.). While the record does not show it, the briefs have stated that O'Connell has been subsequently indicted for perjury in giving the testimony for which the grand jury made this presentment for contempt. But such indictment, if the fact be accepted outside the record, can have no materiality on the present appeal. Before the grand jury the appellant was plainly holding back what he knew as to the extent and duration of his acquaintance with some of the persons whom he admitted knowing. While the materiality of when his acquaintance began may not be obvious, his refusal to state his best recollection made it impossible for the examiner to pursue the inquiry further into matters whose relevancy might have clearly appeared. The scope of a grand jury's inquiry is not to be narrowly limited by forecasts of the probable result of the investigation. Carroll v. United States, 16 F. (2d) 951, 953 (C. C. A. 2). His parrying with the examiner and his constant reiteration of "I don't remember" in respect to matters of which he must have had some recollection indicate to our minds, as they did to the grand jury and the District Court, a determination not to give his best recollection of facts about which he was being interrogated. Such conduct, coupled with his refusal to answer some questions at all, under a claim of privilege which the court had previously instructed him to be inapplicable, furnishes a typical example of recalcitrancy. His attitude was clearly obstructive and contemptuous of judicial authority.

 The final contention of the appellant is that, regardless of the details of his examination, it was a violation of his rights under the Fifth Amendment to require him to be sworn and examined before the grand jury, because its investigation, though ostensibly general, was in reality an attempt to secure from his own mouth evidence upon which to indict him. Some judicial support may be found for such a view. See People v. Gillette, 126 App. Div. 665, 668, 111 N. Y. S. 133; People v. Bermel, 71 Misc. Rep. 356, 357, 128 N. Y. S. 524. But it has not prevailed generally. United States v. Price, 163 F. 904 (C. C. S. D. N. Y.); United States v. Kimball, 117 F. 156 (C. C. S. D. N. Y.); Commonwealth v. Bolger, 229 Pa. 597, 602, 79 A. 113; State v. Cox, 87 Ohio St. 313, 346, 101 N. E. 135; State v. Howat, 107 Kan. 423, 430, 191 P. 585; Wigmore, Evidence (2d Ed.) § 2268. As Prof. Wigmore has aptly said, the constitutional provision is "an option of refusal and not a prohibition of inquiry." Were it otherwise, any suspect would be sacrosanct, and witnesses most likely to know the facts could refuse any aid to an investigation of the crime. The mere summoning of a witness before the grand jury gives no basis for the assumption that his constitutional privilege will be impaired. His duty is to answer frankly until some question is propounded, the answer to which might tend to self-incrimination.

For the foregoing reasons, a majority of the court believes the judgment was without error. It is accordingly affirmed.

MANTON, Circuit Judge (dissenting).

On July 30, 1928, the appellant, a resident of Albany, N. Y., was arrested under a body attachment, taken to the city of New York, because he had failed to answer a subpoena issued to compel his attendance as a witness in the trial of one Otto and others, to be had in the Southern district of New York. At the time, Otto had not been arraigned on the indictment and the date of the trial had not been set. The following morning he was arraigned before the District Court and there held in $10,000 bail for his appearance as a material witness.

Without further process, he was directed to appear before the grand jury, then in session. Advised by counsel, he refused to take the oath or give his name or answer questions. He was hailed before the court and directed to take the oath and answer questions. This he did, answering a number of questions, and, upon being interrogated about his business and his acquaintance with individuals, he declined to answer. He was again brought into court and directed in general terms to answer questions. His refusal to answer was based upon his assertion of a violation of his constitutional rights. He gave as the reasons for his refusal, that the answers would tend to incriminate and degrade him. At the time the grand jury was investigating the so-called Albany baseball pool, which seems to have been a fraudulent scheme, a lottery; and the basis for investigation by the federal grand jury was the use of the mails in connection with this fraudulent scheme. Up to this time the subject interrogated about involved a wide range and scope, which indicated an effort by the United States attorney to, in some way, connect O'Connell with the Albany baseball pool.

Appellant was asked concerning his association with Pringle, Otto, and Kane, who had previously been convicted for participation in a conspiracy. He was interrogated

concerning an indictment of himself in Boston for some connection with the Albany Baseball Pool to which he had pleaded guilty; as to his business and money transactions with Otto, Kane, and Pringle; whether he ever talked with Otto, Kane, Pringle, or Buchanan about the Albany baseball pool or the stock market pool or a pool of the C. C. & B. M. A. He was examined at great length concerning a check of $129,000, drawn to the order of a man named Quinn, which, it was claimed, was drawn in connection with the operation of this alleged criminal conspiracy. He was asked whether he retained a certain lawyer to represent the agents of the Albany baseball pool when they pleaded guilty, concerning a combination sheet and a key card in connection with the operation of a pool, and if he had received $40,000 out of the proceeds of the pool, and if he had placed bets through the pool or if he had anything to do with it. He was then asked if he knew whether the Albany baseball pool was operated in connection with a garage by a man named Dougherty. He made answers to all of these inquiries. No one reading this record in its entirety can escape the conclusion that it was intended to connect appellant with a criminal offense in connection with one of the pools referred to, and it is equally apparent that, when inquiry was made of him as to individuals or places where the pool operated, it was intended to involve the appellant with the operations, even to the extent of sharing in the moneys derived from the operation. He became an object of investigation, as if he were named as a defendant in the proceeding. There could not be a plainer case of a person testifying against himself than that portrayed by this record. His testimony before the grand jury up to this stage consisted of about 35 pages. Finally he was asked:

"Q. Do you know a garage in Albany called Dougherty's Garage? A. Yes.

"Q. How long have you known that garage? A. Six or seven years.

"Q. Who are the proprietors of it? A. I think a man by the name of Dougherty.

"Q. What is his first name? A. John.

"Q. How long have you known him? A. Years.

"Q. How many years? A. Twenty-five.

"Q. Have you ever had any business transactions with him? A. None.

"Q. Have you ever been in his garage? A. Never, other than I might have stopped to get gasoline.

"Q. Have you ever heard of his garage in connection with the Albany baseball pool? A. No.

"Q. Sure of that? A. Yes.

"Q. Had you any knowledge that for a time the Albany baseball pool was operated there? A. None whatever.

"Q. Do you know a place in Albany called Malloy's? A. I refuse to answer that on the grounds it might tend to incriminate and degrade me.

"Q. Is Malloy's at the corner of Van Zant and Hamilton Streets, Albany? A. I refuse to answer that question on the grounds it might tend to incriminate and degrade me.

"Q. Do you know a man by the name of Malloy? A. I refuse to answer that question on the ground it might tend to incriminate and degrade me."

Thereupon the witness was taken before the judge. The United States attorney addressed the court at considerable length, and read selected questions and answers of the witness' testimony before the grand jury, and said: "I therefore ask you to punish him for the contempt I have seen before the Grand Jury." Counsel for the appellant protested, and argued that the United States attorney had compelled the appellant to incriminate himself before the grand jury; that there was nothing evasive in his answers. What was claimed to be an evasion were answers as to the length of time he knew certain people, and as to these he said he did not know or was unable to say. At the same time he was reminded that he was charged with having evaded a subpoena resulting in the body attachment. The question was argued at some length, and finally counsel for the appellant objected to the procedure in the contempt proceeding. Then the following took place:

"Mr. Cuff: All right, but I say he was brought down here that way. There is no question in my mind about that and this witness has come here and answered certain questions which your Honor ruled he should, and now they are proceeding against him—

"The Court: I not only ruled that he should answer certain questions. I gave him instructions as to his general procedure, as is entirely proper in any case where a witness is called before the Grand Jury. There is not a shadow of doubt, not a shadow of doubt, on the record before me, that he has wilfully and deliberately obstructed the processes of the Court in not answering *truthfully and fully* the proper questions put to

him in the proceeding before the Grand Jury. If there ever was a flagrant contempt, it is in this case—perfectly flagrant."

There was no record before the court except the statement of the United States attorney. The grand jury had not certified the questions which there had been a refusal to answer on constitutional grounds, nor had proceedings been started by any order or rule to show cause with accompanying affidavits. Then the following took place:

"Mr. Cuff: May we have specified what the questions were?

"The Court: There are a dozen questions in that.

"Mr. Cuff: I think we are entitled to have him specify the questions.

"The Court: The only question I have any doubt about, because I am unfamiliar with it, is the exact procedure whether or not there should be a specific complaint and whether I should read the record alone before the Grand Jury and the witness being in open court, the Court is empowered to punish for contempt. I am not sure. I don't know."

But, as if in relief, the United States attorney stated:

"I have had occasions before and my assistants also, to go through these cases, although not in as flagrant a case, and the Judge has taken summary action, whatever the Judge thought was the proper thing. * * *

"The Court: The contempt order is based on the conduct of the witness, the completely evasive conduct of this witness before the Grand Jury in not answering or in evading the answers to numerous questions which have been read by the District Attorney."

It would unduly lengthen this opinion to quote all the questions read. It is sufficient to say that the so-called evasive answering consisted of instances where the witness was uncertain as to the number of years he knew the persons concerning whom he was interrogated or doubt expressed by him as to whether he knew certain other persons. The final questions about which he was hailed before the court the last time on the claim of contemptuous conduct in the grand jury room did not receive attention in the discussion in court. His right to refuse to answer these seems not to have been considered. In view of the scope and range of the inquiry which had transpired, until the questions were asked as to Malloy and the appellant's acquaintance with him, it appeared with unerring certainty that an effort was made to incriminate the appellant or connect him with the baseball pool. In refusing to answer on the ground that the questions tended to incriminate or degrade him, he unquestionably acted in good faith. If he was in error in his claim of constitutional protection under the Fifth Amendment, the court might well have instructed him accordingly and required him to answer the questions, as it had on two previous occasions. After such previous instruction he answered questions asked, many of which seem in direct violation of his constitutional protection. The answer to the questions suggested to have been incredible or evasive justified no reasonable conclusion that the appellant's conduct was contumacious or obstructive. Reading all of the testimony refutes the claim that the appellant willfully and deliberately obstructed the processes of the court in not answering. If he answered untruthfully, the law as to perjury punishes him. But he gave his testimony, and neither the examiner nor the court could reasonably say that his testimony was false. Nothing appears to show that they had knowledge of facts which were contrary to his testimony. The constitutional privilege which he asserted was his protection in the grand jury room to the effort then obviously made to establish his connection with some criminal offense.

If the record had been strictly adhered to, when the appellant was hailed before the court and punished, and a more deliberate consideration of the facts were had, the authority and dignity of the court would have been fully upheld by advising and directing the witness as to his position on the claimed privilege.

Calling a prospective defendant before a grand jury investigating a criminal proceeding has been severely condemned. Counselman v. Hitchcock, 142 U. S. 547, 12 S. Ct. 195, 35 L. Ed. 1110; Brown v. Walker, 161 U. S. 591, 16 S. Ct. 644, 40 L. Ed. 819; People v. Ferola, 215 N. Y. 285, 109 N. E. 500; People v. Gillette, 126 App. Div. 665, 111 N. Y. S. 133. To compel him to take an oath virtually compels him to be a witness against himself. People v. Ferola, supra; Brown v. Walker, supra.

In Cooke v. United States, 267 U. S. 517, 45 S. Ct. 390, 69 L. Ed. 767, where a contempt of court was charged for having written an objectionable letter to a judge, the court pointed out the necessity of proper procedure in instituting and hearing the contempt charged, and made clear the distinction between a contempt committed under the eye or within the view of the court, where the

court may proceed upon its own knowledge of the facts and punish the offender without further proof and without issue or trial in any form. See, also, In re Terry, 128 U. S. 289, 9 S. Ct. 77, 32 L. Ed. 405. In Ex parte Savin, Petitioner, 131 U. S. 267, 9 S. Ct. 699, 702, 33 L. Ed. 150, speaking of contempt, the court said:

"In cases of misbehavior of which the judge cannot have such personal knowledge, and is informed thereof only by the confession of the party, or by the testimony under oath of others, the proper practice is, by rule or other process, to require the offender to appear and show cause why he should not be punished."

Where the contempt is not in open court, there is no reason or right for dispensing with charges and the opportunity of the accused to present his defense by witnesses and argument. If it be a contempt committed before the grand jury, the practice has been to certify the record to the court, Loubriel v. United States, 9 F.(2d) 807 (2d C. C. A.), or make a presentment thereof, People ex rel. Hackley v. Kelly, 24 N. Y. 74, or by the grand jury confronting the accused personally, Wilson v. United States, 221 U. S. 361, 31 S. Ct. 538, 55 L. Ed. 771, Ann. Cas. 1912D, 558. Assuming that the testimony given before the grand jury is in the presence of the court and was untruthful only, it would not be a contempt. In Ex parte Hudgings, 249 U. S. 378, 39 S. Ct. 337, 339, 63 L. Ed. 656, 11 A. L. R. 333, the court held that a District Court had no power to adjudge a witness guilty of contempt solely because in the court's opinion he is willfully refusing to testify truthfully and to confine him until he shall purge himself by giving testimony which the court deem truthful. The charge of failure to testify truthfully seems to have been the gravamen of the appellant's offense. In the Hudgings Case, supra, the court said:

"An obstruction to the performance of judicial duty resulting from an act done in the presence of the court is, then, the characteristic upon which the power to punish for contempt must rest. This being true, it follows that the presence of that element must clearly be shown in every case where the power to punish for contempt is exerted—a principle which, applied to the subject in hand, exacts that in order to punish perjury in the presence of the court as a contempt there must be added to the essential elements of perjury under the general law the further element of obstruction to the court in the performance of its duty. As illustrative of this,

see United States v. Appel (D. C.) 211 F. 495. It is true that there are decided cases which treat perjury, without any other element, as adequate to sustain a punishment for contempt. But the mistake is, we think, evident, since it either overlooks or misconceives the essential characteristic of the obstructive tendency underlying the contempt power, or mistakenly attributes a necessarily inherent obstructive effect to false swearing. If the conception were true, it would follow that when a court entertained the opinion that a witness was testifying untruthfully the power would result to impose a punishment for contempt with the object or purpose of exacting from the witness a character of testimony which the court would deem to be truthful; and thus it would come to pass that a potentiality of oppression and wrong would result and the freedom of the citizen when called as a witness in a court would be gravely imperiled."

What seems to be the offense committed by the appellant is the claim of apparent untruthfulness in his answers by being false in statement. This alone, assuming it to be established, was not a contempt. But his statements and conduct before the grand jury were neither false nor contumacious.

The decree should be reversed.