### UNITED STATES v. McGOVERN.

District Court, S. D. New York.

June 3, 1932.

George Z. Medalie, U. S. Atty., of New York City (Thomas E. Dewey and David Paley, Asst. U. S. Attys., both of New York City, of counsel), for the United States.

Daniel F. Cohalan, of New York City (John F. Collins, Harry S. Bandler, David Cahill, and George J. Langley, all of New York City, of counsel), for McGovern.

WOOLSEY, District Judge.

I adjudge Patrick McGovern in contempt.

I. I have carefully read, twice, in full, the whole transcript of all the evidence given by Mr. McGovern which was embodied in the presentment before me. It is all relied on by the United States, and, in addition, the United States has filed certain specifications which constitute a kind of bill of particulars which are hereby referred to, and by such reference embodied in this opinion.[1]

II. The question of self-incrimination is not involved here in any way owing to the letter of May 9, 1932, in which the United States has released the witness from all liability, both civil and criminal, in respect of his income taxes during the period covered by the inquiry herein.

We, therefore, are not concerned with the defendant's constitutional rights not to be forced to incriminate himself, but only with the question of his attitude toward the grand jury.

III. I think it is proper to say that the untruthfulness of many of Mr. McGovern's answers is a necessary inference from the evidence put before me in this presentment, and is not merely a possible inference, as the Court of Appeals found of Dr. Doyle's an-

[1] See note 1 at end of opinion.

swers in People ex rel. Falk v. Sheriff of New York County, 258 N. Y. 437, at page 439, 180 N. E. 110.

In my opinion, the evidence here meets all the requirements of proof beyond a reasonable doubt necessary to justify punishment for criminal contempt, under the principles laid down in Michaelson v. United States, 266 U. S. 42, 45 S. Ct. 18, 69 L. Ed. 162, 35 A. L. R. 451, and Gompers v. Buck's Stove & Range Co., 221 U. S. 444, 31 S. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874, in that the answers of the witness are shown to have been to a large extent untrue and in that he was evasive and was obstructing the investigation by the grand jury as far as it lay in his power to do so. This is obvious on most of the 202 pages of his evidence which have been submitted to me.

The record shows that Mr. McGovern was duly sworn. This means that he was sworn before his God to tell the truth, the whole truth, and nothing but the truth. His testimony is a sad commentary on the slight effect which this oath had on him. That he has never told the whole truth to the extent that inquiry in regard to it was made of him is clear on the face of his testimony, and he himself has admitted at many places in the evidence that earlier answers given by him were not true.

IV. The grand jury, not only historically but also in its present-day functioning, is necessarily an inquisitorial body, and may, if it wish, institute an investigation based on its suspicion that crimes have been committed without having any knowledge of the names or descriptions of the persons who may be involved. The inquiry does not have to be limited to the determination of the kind of crime which known persons may have committed.

If I assume the truth of Mr. McGovern's answers that he did not pay any of the money drawn by him from the bank—by the checks referred to in the government's specifications and in the evidence—to Mr. Commerford, Mr. McConville, and/or Mr. Huddell, non constat that others who had not made income tax returns and should have done so, or who had made false returns, might have received some of this money and not accounted for it in their income tax returns.

Consequently, the argument of counsel for the witness that Mr. McGovern might do what he would with his own does not meet the situation.

Assuming, for argument's sake, that he himself did not need to report the expenditures by an information return under the provisions of 26 U. S. Code, §§ 2148–2151 (26 USCA §§ 2148–2151), because that question is out of the case under the letter of release of May 9th, above referred to, those who received the moneys were required, except in the case of outright gifts to them, or sales made to Mr. McGovern, to file returns which would have included such payments.

The income tax laws with their interlocking reports have to a large extent woven the pecuniary activities of men into a kind of accounting texture in which the government may pick out and follow for its own purposes what strands it pleases. But if the strand is cut and an investigation of large expenditures, such as these, is so obstructed that it is left unexplained, revenues to which the government is entitled may be withheld by recalcitrant taxpayers almost at will.

V. It is quite true, as counsel for the witness contends, that this case differs somewhat in its facts from the case of O'Connell v. United States (C. C. A.) 40 F.(2d) 201, which was perhaps a stronger case against the witness, because the witness there entirely refused to answer many questions on the ground that he might be incriminated, when it was obvious that such a result was impossible.

That case, however, justifies the procedure here followed, and support for my views on the merits is found in United States v. Appel, 211 F. 495, decided by Judge Learned Hand in this District, and in Lang v. United States, 55 F.(2d) 922 (C. C. A. 2), which is as nearly like the instant case in its essential structure as one case ever is to another.

In United States v. Appel, 211 F. 495, (D. C. S. D. N. Y., June 1913), Judge Learned Hand said: "The rule, I think, ought to be this: If the witness' conduct shows beyond any doubt whatever that he is refusing to tell what he knows, he is in contempt of court. That conduct is, of course, beyond question when he flatly refuses to answer, but it may appear in other ways. A court, like any one else who is in earnest, ought not to be put off by transparent sham, and the mere fact that the witness gives some answer cannot be an absolute test. For instance, it could not be enough for a witness to say that he did not remember where he had slept that night before, if he was sane and sober, or that he could not tell whether he had been married more than a week. If a court is to have any power at all to compel an answer, it must surely have power to compel an answer

which is not given to fob off inquiry. Nevertheless, this power must not be used to punish perjury, and the only proper test is whether on its mere face, and without inquiry collaterally, the testimony is not a bona fide effort to answer the questions at all."

Referring with approval to this statement by Judge Hand, Chief Justice White, in Ex parte Hudgings, 249 U. S. 378, at page 393, 39 S. Ct. 337, 339, 63 L. Ed. 656, 11 A. L. R. 333, said: "An obstruction to the performance of judicial duty resulting from an act done in the presence of the court is, then, the characteristic upon which the power to punish for contempt must rest. This being true, it follows that the presence of that element must clearly be shown in every case where the power to punish for contempt is exerted—a principle which, applied to the subject in hand, exacts that in order to punish perjury in the presence of the court as a contempt there must be added to the essential elements of perjury under the general law the further element of obstruction to the court in the performance of its duty."

The Circuit Court of Appeals, in the O'Connell Case, 40 F.(2d) 201, held that obstruction of the grand jury would come within this rule and also within the provisions of the United States Statutes, 28 U. S. Code, § 385, and so would be in the court or sufficiently near thereto to justify summary punishment for contempt. That statement of the law in that court is, of course, binding on me, and I hold that this case falls within that rule.

The opinion of the Court of Appeals of New York in People ex rel. Falk v. Sheriff of New York County, 258 N. Y. 437, 180 N. E. 110, referred to in the argument as the Doyle Case, does not lay down or imply any principle contrary to these decisions. On the contrary, the Appel Case was referred to with approval. It was pointed out by the Court of Appeal that the obstructive tactics of the witness Doyle, if any, would have been in contempt of a legislative inquiry and not of a court. So far as the courts were concerned he was not held in contempt because the falsity of his answer to a question which the court in Doyle v. Hofstader, 257 N. Y. 244, 177 N. E. 489, had ordered him to answer was merely doubtful.

The Court of Appeals held that under such circumstances it had no right to punish Doyle for contempt, but that the question of obstructive tactics on the part of Doyle was to be left, as is said in so many words, for some other tribunal, indicating, of course, the Legislature.

But I am not holding Mr. McGovern in contempt in this case because of his answers in regard to Commerford, McConville, and Huddell. He obeyed me and answered as to them. My decision is based on his frequent untrue and evasive answers to questions and his continued obstructive tactics as clearly shown again and again by the record before me.

The three federal cases above referred to of Appel, O'Connell, and Lang are controlling on my decision and, indeed, would preclude my deciding in favor of the witness on the facts which I think are here shown, even if, in the absence of such authorities, I should have been inclined to do so. But I should not have been so inclined.

Candid and truthful evidence is the foundation of the administration of justice. Instance courts and grand juries are primarily seekers for truth, and must not be thwarted in their quest unless constitutional grounds can be properly invoked. For a court to countenance such an obstructive attitude towards its grand jury as this witness showed throughout a large part of his evidence and by all of the latter part of his evidence would, in my opinion, be to make a confession of futility in the enforcement of the criminal law, in an era when, perhaps more than ever, the greatest possible firmness is needed.

VI. I will now hear counsel on the question of the sentence which should be imposed as a result of this judgment.

Thereupon after exceptions to this ruling made on behalf of the witness and argument as to the sentence, the witness Patrick McGovern was sentenced to be punished for the contempt above referred to and ordered committed to the Federal House of Detention for a period of sixty days.

NOTE 1.—The answers set forth below, among others, in the record of the testimony of Patrick McGovern before the April, 1932, afternoon federal grand jury for the Southern district of New York, are hereby specified as the answers which it is charged were evasive, contumacious, contemptuous, and obstructive of the due process of the federal court and the administration of justice:

"Q. Do you remember the transaction? A. No, sir.
"Q. Do you remember whether you deposited that check to any account that you had? A. I refuse to answer that question.
"Q. On what ground? A. Constitutional rights.
"Q. You must state what the ground is. Is it on the ground it might tend to incriminate you? A. Incriminate or—
"Q. Degrade doesn't count. You mean incriminate? A. Yes, sir. * * *" (S. M. p. 18.)
"Q. Did you receive the check? A. I couldn't say.
"Q. Did you get the money? A. I couldn't tell that.

"Q. Is that same answer true of the last check? A. The same answer answers this check.

"Q. Do you mean you can't say whether or not you received the money? A. I can't say whether I received the money.

"Q. You mean as to each of those two checks you have no recollection? A. I have not.

"Q. I show you Gov. Ex. 5, being a check of $70,000 to your order, dated July 11, 1928, also signed by you as president, endorsed by you and E. D. Hubbard. I ask you if you recall having issued that check? A. Those are my signatures; I don't recall issuing the check.

"Q. Did you receive the check? A. The same answer, I refuse to answer.

"Q. On what ground? A. Might incriminate." (S. M. pp. 18, 19.)

"Q. Do you remember having received the check? A. The same answer.

"Q. I don't know what that is. You have given us several. A. I don't remember personally receiving that check, but I don't care to answer that question, it might incriminate.

"Q. You have answered that you don't remember receiving $160,000 on or about that date from Patrick McGovern, Inc. A. If the check was cashed that day, undoubtedly I did.

"Q. What was done with the cash? A. I don't answer that question.

"Q. You mean you decline to answer? A. Yes, sir.

"Q. On the ground it might incriminate you? A. Yes, sir." (S. M. pp. 19, 20.)

"Q. You remember receiving the check? A. I don't remember the check.

"Q. Do you remember the transaction? A. No, sir.

"Q. Do you remember receiving $50,000 on or about that date? A. No, sir.

"Q. You remember nothing about it? A. No." (S. M. p. 20.)

"Q. Will you tell me what these checks were for? A. I refuse to answer.

"Q. On the ground it might incriminate you? A. Incriminate me." (S. M. p. 21.)

"Q. What were they issued for? A. I refuse to answer.

"Q. On what ground? A. It might incriminate me." (S. M. p. 25.)

"Q. What do you remember about those transactions on those five checks? A. I refuse to answer.

"Q. On what ground? A. Incriminate me.

"Q. Do you claim it would tend to charge you with a Federal crime or a State crime? A. I don't understand.

"Q. Federal crime is, for example, the filing of a false income tax return. You undoubtedly have the right—there can be no question about that—to refuse to give us any information that would develop any proof against you that you had failed to make a true return of your income tax. I don't want to ask you what crime you have in mind, that would not be fair to you. If you bribed somebody, a State or Municipal official, that would be a State crime, not a Federal crime. All I want to say—and I don't mean it is necessarily either of those crimes—is it a State or Federal offense you have in mind? A. I won't answer that question.

"Q. We are interested here in trying to find out whether any persons received income, persons other than yourself received income for which they have failed to make a proper return and payment to the U. S. Government. A. I refuse to answer that question.

"Q. You won't tell us about any payments—about any such persons? A. No, sir.

"Q. Do you mind telling me whether these five checks aggregating $380,000 were for a corporate purpose or a personal purpose? A. I refuse to answer that.

"Q. On the same ground? A. Yes, sir." (S. M. pp. 31, 32.)

"Q. Did you have any financial transactions with Commerford directly or indirectly? A. I refuse to answer that.

"Q. On the ground it might incriminate you? A. Yes, sir.

"Q. Now, I asked you to state what financial transactions you had with Commerford during 1928; state it please. A. I didn't know Mr. Commerford in 1928.

"Q. Did you have any financial transactions indirectly with him in 1928? A. I refuse to answer that.

"Q. On what ground? A. Incriminate against me.

"Q. Did you have any financial transactions directly or indirectly with Patrick Commerford in 1929? A. I refuse to answer.

"Q. State the ground. A. It would incriminate against me.

"Q. The proper language is 'on the ground it might tend to incriminate.' We won't take advantage of you on the language. In 1930 did you have any financial transactions with Patrick Commerford directly or indirectly? A. I refuse to answer on the ground—

"Q. Same grounds? A. Same grounds.

"Q. In 1928 did you pay any money to Patrick Commerford? A. I refuse to answer.

"Q. On the same grounds? A. Same grounds.

"Q. In 1929 did you pay any money to Patrick Commerford? A. I refuse to answer.

"Q. On the same grounds? A. Same grounds.

"Q. In 1930 did you have any financial transaction with Patrick Commerford? Did you pay any money to him? A. I refuse to answer on the same grounds.

"Q. In 1928 did you pay any money directly or indirectly to Mat McConville? A. I refuse to answer on the same grounds.

"Q. And in 1929 did you pay any money to Mat McConville? A. I refuse to answer on the same grounds.

"Q. In 1930 did you pay any money directly or indirectly to Mat McConville? A. I refuse to answer on the same grounds.

"Q. In 1928 and 1929 and 1930 did you pay any money to any other officials or representatives of the Hoisting Engineers Union? A. I refuse to answer on the same grounds.

"Q. Do you know Arthur Huddell? A. I did know him.

"Q. He is dead now? A. Yes.

"Q. Was he the president of the International Hoisting Engineers Union? A. I believe he was.

"Q. You so understood? A. I did.

"Q. And you have met him from time to time? A. Yes.

"Q. Now, did you pay any money to him in 1928, 1929, and 1930? A. I refuse to answer on the same grounds.

"Q. I will ask you again as to McConville and Commerford, did you at any period more than two years ago, in 1928, 1929 and 1930, pay any money to Patrick Commerford and Mat McConville? A. I refuse to answer on the same grounds.

"Q. Or to Patrick Commerford or Mat McConville? A. I refuse to answer on the same grounds.

"Q. You understand my question, I don't want you now by this question to tell me anything that is less than two years old. I want you to tell me only what is more than two years old; will you answer that? A. No.

"Q. You refuse on the same grounds? A. Same grounds.

"Q. The reason I put it that way is that the giving of an unlawful fee to an employee is a misdemeanor under the laws of the State of New York and is barred by a two-year Statute of Limitations, so I am not asking you to tell me anything that occurred within two years, you understand that? A. Yes, sir.

"Q. Do you still refuse to answer? A. I do.

"Q. The last question? A. I do.

"Q. As to anything more than two years old? A. That I refuse to answer.

"Q. On the same grounds? A. Same grounds.

"Q. Now, Mr. Foreman, I ask that the Grand Jury direct this witness to answer all of the questions which he has refused to answer on the ground it may incriminate him, that the answer might incriminate him.

"Foreman: You are so directed.

"Q. Will you obey the direction of the Grand Jury? A. No." (S. M. pp. 33-36.)

"Q. Now, you heard the court's direction given to you in the presence of counsel? A. Yes.

"Q. That you answer the questions which I asked you? In 1928 did you pay any money to Patrick Commerford? A. Not a nickel.

"Q. To Mat McConville? A. No, sir.

"Q. To Arthur Huddell? A. No, sir.

"Q. In 1929 did you pay any money to any of these men? A. Not a cent.

"Q. In 1930 did you pay any money to any of these men? A. Not a cent.

"Q. Did you have any financial transactions in those three years with any of these men? A. No, sir.

"Q. Directly or indirectly? A. No, sir.

"Q. Why then did you claim it might tend to incriminate you to tell the Grand Jury whether or not you paid any money to them or any of them in those three years? A. Well, I have to protect my Constitutional rights.

"Q. But you had paid no money to them; why did you claim that it was necessary to protect your Constitutional rights? A. I was advised to do so.

"Q. You mean even though you had not paid any money, you felt it was necessary to your Constitutional rights to refuse to answer questions on that subject? A. I did.

"Q. Will you now tell me what the $380,000 represented by the five checks, Exhibits 1 to 5, inclusive, was concerned with? A. No, I won't tell you that.

"Q. Now, did any of these five checks have anything to do with any money paid directly or indirectly to Commerford, McConville, or Huddell? A. Absolutely no.

"Q. Was any of this money paid to any other person? A. No, sir.

"Q. None of it?. A. Not to any person that you have mentioned.

"Q. Any other person, John Jones, William Smith, anybody you please? A. Moneys paid out to different people and given away, but nobody in connection with the gentlemen you mentioned.

"Q. So you stated. Now, please state who the persons are who received this money? A. I never kept any record, I couldn't tell.

"Q. Apart from whether you kept any record or not, to whom did you pass this money on or any part of it? A. It was taken out at times and put in a drawer and I took the money as I wanted it for general expenses.

"Q. What expenses? A. Living expenses, many other things, private expenses." (S. M. pp. 36-38.)

"Q. What did you do with that money? A. I refuse to answer, it is a personal matter." (S. M. p. 40.)

"Q. What was the reason you drew down $330,000 in five checks in 1928? A. I can't give any special reason.

"Q. You had no reason? A. It was a personal matter." (S. M. p. 45.)

"Q. I offer them in evidence (checks marked Gov. Exhibits 11, 12, and 13). The fourth check, June 7, 1928, is to your order for $160,000, it is endorsed by you and was paid, as indicated by the stamp, without deposit; that means it was cashed, paying teller No. 2 paid you; look at that. A. Yes, sir.

"Q. Remember that transaction? A. I do not.

"Q. What did you do with the cash? A. I refuse to answer; it is a personal matter.

"Q. Now, you refuse to answer because it is a personal matter? A. Yes, sir." (S. M. p. 46.)

"Q. And on August 14, 1928, two months and one week later, you again drew down $160,000 in cash, why did you do that? A. Personal matter.

"Q. Do you remember the transaction? A. No, not distinctly.

"Q. What is personal about it if you don't remember? A. Personal—it is my money and there must have been some good reason for me drawing it down.

"Q. There must have been some very good reason. A. I don't know, it is some personal reason, I don't remember just exactly what it was." (S. M. pp. 47, 48.)

"Q. Where did you keep this money, in a drawer? A. In a drawer in the bank.

"Q. Safe deposit box? A. Yes, sir.

"Q. Which bank? A. Chase National Bank.

"Q. Which branch? A. 41st St.

"Q. How long have you had that box in that bank? A. A number of years.

"Q. Do you mean it goes to before 1928? A. I think so." (S. M. p. 48.)

"Q. In which of the various boxes did you keep this cash? A. In my personal box." (S. M. p. 49.)

"Q. How often did you go to this safe deposit box to take out cash? A. I couldn't say, I don't keep any records.

"Q. I know you don't; how often did you go, a few times a year to draw down cash from your safe deposit box? A. Perhaps three or four times a month." (S. M. p. 50.)

"Q. The money that you kept in the office is money that is covered by a specific check for cash, petit cash? A. No, sir, I have a personal box.

"Q. How much do you keep in the office? A. In my room from $1,000 to $15,000 or $20,000.

"Q. And beyond that, the big money is kept in the safe deposit box? A. Yes, sir.

"Q. I ask you to state to whom you gave any substantial quantity of cash in 1928? A. I don't remember, I don't have any names, there were some substantial sums to my family." (S. M. p. 50.)

"Q. To whom did you give the money? A. I gave some to my family and gave some to charity and some to others; I kept no track of it, I don't know who they were.

"Q. Are those the only people you gave the money to? A. Yes, sir." (S. M. p. 79.)

"Q. Will you please state the names of individuals to whom you paid money out of these cash funds in 1928? A. I can't do it.

"Q. Give the name of any individual to whom you paid any such money? A. Outside of my family, I can't give you any names; I don't remember." (S. M. p. 80.)

"Q. Why was $160,000 drawn out by check, redeposited, and shortly afterwards, within a couple months, a similar one issued? A. I can't answer that only in the same way as the other, that perhaps at that time to meet emergencies—the bank balances were pretty high and we thought it good business policy to do so.

"Q. It was redeposited the first time you drew it on the same day, wasn't it? A. That I don't know.

"Q. Just about then; whether it is a day or two is not important. A. I wouldn't know a thing about that.

"Q. You would know whether it was redeposited? A. I wouldn't know anything about that.

"Q. Did Miss Boyce just wish $160,000 in cash on you without consulting you? A. Oh, no, I signed the check for that.

"Q. Then you knew you were going to draw down $160,000 in cash? A. Yes, sir.

"Q. You remember that was redeposited, don't you? A. I remember since these hearings started; before that I forgot all about it." (S. M. p. 83.)

"Q. Now on page 17 of your testimony the first time you were here the following questions and answers were put and received: 'Q. I show you Government's Exhibit, being a check of April 5, 1929, to your order, signed by you as president and treasurer of the corporation, for $50,000 and containing your signature. I ask you if you have ever received that check before? A. That check before? That is my signature. Q. Have you received the

check? A. I presume I did. Q. Look at it and tell us whether or not you received that check. A. It is my signature, whether I or somebody else got the money— Q. Do you remember the transaction? A. No, sir. Q. Do you remember what you did with the money? A. No, sir. Q. Do you remember whether you deposited that check to any account that you had? A. I refuse to answer that question. Q. On what ground? A. Constitution rights. Q. You must state what the ground is. Is it on the ground it might tend to incriminate you? A. Incriminate.' What was it, Mr. McGovern, which between the question to which you answered that you didn't remember the transaciton and three lines further down you remembered enough to know that it might incriminate you to answer. What refreshed your recollection so amazingly between two questions? A. I thought at that time there was some question up before the Government, a tax matter that wasn't settled, and it occurred to me at that time that I better take that standing until that question was fully settled.

"Q. In other words, you now remember having failed to give that reason for two entire examinations? A. That's my best recollection that I can give you on that.

"Q. You couldn't think of that answer though the first time you were here, is that it? A. The question wasn't settled with the Government.

"Q. You were asked what reason it was—what kind of a crime, Federal or State, and you wouldn't give an answer. A. I didn't know what the examination was for at the time of the first examination." (S. M. pp. 107-109.)

"Q. These checks though cover all such items. Now, what kind of living expenses do you have to pay in cash or did you want to pay in cash? A. Certainly doctor bills—

"Q. You mean to say you paid doctors in cash? A. Sometimes I did, yes.

"Q. Who? A. I think there was a Dr. Stammers I paid in cash.

"Q. How much did you pay him in cash? A. I couldn't say: I may be mistaken about that.

"Q. I see here the check to Dr. Stammers of July 1st, 1930, showing that it was the first of the month bill and that he rendered bills in the sum of $5,000. Did your practice change from cash to check with Dr. Stammers? A. I don't think I ever received a bill from Dr. Stammers.

"Q. There's a check payable to his order. A. He got money from checks and I think in cash.

"Q. Is it your testimony that you did pay Dr. Stammers money in cash? A. No, I didn't; I paid other bills in cash during sickness.

"Q. What other bills? A. To my daughters, money to meet other expenses.

"Q. Let's get this sickness business cleared up. What doctors did you pay in cash? A. Except I paid Dr. Stammers I didn't pay anybody in cash.

"Q. You see right here you paid him by check— do you mean other times you paid him in cash? A. I am not clear on that; I wouldn't swear to that." (S. M. pp. 150, 151.)

"Q. What else did you do with this money? A. Spent it.

"Q. How? A. Some for entertaining.

"Q. Entertaining where? A. Around New York.

"Q. What kind of entertaining? A. Dinners; meeting friends.

"Q. That sort of entertaining might cost you $100 for an evening or $150 or $200, might it not? A. It might cost me $5,000." (S. M. p. 152.)

"Q. Why did you refuse to testify about part of the money when you were willing to testify about the rest? What was there about that part which gave you any doubt in your mind? A. I must have gotten confused about the question.

"Q. You said that several times, Mr. McGovern, what was the other things that you spent money on which you haven't yet told us? A. There was nothing.

"Q. Then your testimony was false that there was some money that you spent that you didn't tell us about? A. No, there was no money that I spent that I didn't tell you about." (S. M. pp. 162, 163.)

"Q. You went down to the court and the court instructed you to answer. You came back up here and on page 46 of the testimony you were asked, 'With regard to the check for $160,000, what did you do with the cash? A. I refuse to answer; it is a personal matter.' You just got through telling us that you didn't refuse to answer any question. Why did you refuse to answer about that matter? A. I didn't understand the question." (S. M. pp. 164, 165.)

"Q. What business purposes did you spend that money for? A. I suppose entertaining would be one.

"Q. All right, what other business purpose did you spend this $380,000 for or any part of it? A. I don't recall any other." (S. M. p. 166.)

"Q. Can you tell me what you spent any other money on for entertainment? A. I don't know; I never kept tabs on any money I spent for entertainment.

"Q. All right, Mr. McGovern, I want you to tell me some of the money you spent on entertainment other than liquor? A. I don't recall any just now.

"Q. Can you think of a single penny that you spent on anything other than liquor for entertainment? A. Oh, yes.

"Q. All right, tell me. A. I gave tips to men and paid people for being around and serving and so forth.

"Q. Tips? A. Yes.

"Q. That's a second one then, all right. What other purpose did you spend that cash on for entertainment? A. I don't know; I don't remember of any of them.

"Q. You can't think of a single penny other than for tips or liquor that you spent any of that money on for entertainment? A. That's all; that's all I can remember now." (S. M. pp. 193, 194.)

"Q. Now, you testified that you spent some of it on your family, that you gave some of it to your family? A. I did.

"Q. Whom did you give it to? A. My daughters.

"Q. Which daughters? A. Mrs. McGovern, my daughter, Mary, my daughter, Helen, and my daughter Alice.

"Q. Now, can you tell us in how large sums you used to give them this cash to carry around New York City? A. No, I can't tell you.

"Q. How large sums did you give it to them in? A. It depended entirely on what they wanted, sir, and what they told me. I can't even make a guess on that.

"Q. That's the best story you can give on that? A. That's the only story, sir, I can remember; that's my best recollection.

"Q. Now you testified that you gave some of it to charity? A. Yes, I did.

"Q. Did you give much of it to charity? A. A great deal.

"Q. A great deal? A. Yes.

"Q. Whom did you give it to? A. I don't know; from day to day, I'd meet people on the street that would be hard up perhaps, tell a story, need money, and I'd give them some money.

"Q. You mean you would give them a few hundred dollars, somebody on the street? A. Yes.

"Q. Maybe a few thousand dollars, Mr. McGovern? A. Perhaps that happened.

"Q. Just to somebody on the street and he told you a hard luck story and you gave him a few thousand dollars out of your pocket? A. No, no, not that, I don't pay much attention to hard luck stories.

"Q. What did you pay attention to? A. People that I thought needed money and needed charity.

"Q. You just dug into your jeans and handed them on the street a few thousand dollars? A. No.

"Q. What is it then? A. I don't know the amounts I gave them; I gave them some money; it depended entirely on the case.

"Q. Now, will you tell us some of the people you gave that charity to? A. I don't remember.

"Q. Well, now, you say you gave a deal of it to charity. A. I did; I gave a great deal of it to charity.

"Q. You also say you continued doing this right up to the present time out of this $380,000, you testified to that, didn't you? A. I did." (S. M. pp. 194, 195.)

"Q. Well, now, let's take the period from the beginning of the year 1928. In the years 1928, 1929, 1930, 1931 and 1932 to date, to whom have you given money in cash for charity? A. I can't recall any names at this time only as I told you in my previous statements.

"Q. Can you think of any institutions you have given any money in cash to during that period? A. No.

"Q. Well, now, if you gave any substantial sums, Mr. McGovern you ought to be able to remember whom you gave them to? A. I don't think I would.

"Q. You wouldn't remember a single individual? A. No, I don't think I would.

"Q. In all that time? A. No, sir, I don't think I would." (S. M. pp. 196, 197.)

"Q. Why didn't you keep a record of that because you could get credit for it on your income tax? A. I couldn't get credit on my income tax.

"Q. Because you mean your donations for each year was as much as 15% of your income? A. Yes, far more." (S. M. p. 198.)

"Q. If your other donations had not been as much as 15% of your income then you should have kept a record of these contributions in cash, shouldn't you? A. Well, there's no danger but that they were always going to be more." (S. M. p. 198.)

George Z. Medalie, United States Attorney.